Judge OHLSON delivered the opinion of the Court.
Contrary to his pleas, a panel of officer and enlisted court-martial members convicted Appellant of attempted murder (three specifications) and premeditated murder (two *371 specifications), in violation of Articles 80 and 118, Uniform Code of Military Justice (UCMJ), 10 U.S.C. §§ 880, 918 (2000). The fifteen-member panel sentenced Appellant to death. The convening authority approved the adjudged sentence, and the United States Army Court of Criminal Appeals (CCA) affirmed the findings and sentence. United States v. Akbar, No. ARMY 20050514, 2012 CCA LEXIS 247, at *102, 2012 WL 2887230, at *32 (A.Ct.Crim.App. July 13, 2012) (unpublished). Appellant’s case is now before us for mandatory review under Article 67(a)(1), UCMJ, 10 U.S.C. § 867(a)(1) (2012).
Overview of the Case
The evidence adduced at trial showed that on the night of March 22, 2003, as American armed forces were preparing to launch Operation Iraqi Freedom from their staging area in Kuwait, Appellant threw grenades into three of the tents of his fellow servicemem-bers and opened fire with his M-4 rifle, killing two military officers and wounding fourteen others. The ensuing investigation revealed that Appellant previously had written in his diary of his intent to “kill as many of [his fellow servicemembers] as possible” as soon as he arrived in Iraq.
Although Appellant raises a number of issues for review, the gravamen of his appeal focuses on whether his attorneys provided ineffective assistance of counsel. The Supreme Court has set a high bar for an appellant to prevail on such a claim. Specifically, the seminal case of Strickland v. Washington, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984), requires an appellant to show that: (1) his counsel’s performance fell below an objective standard of reasonableness; and (2) the counsel’s deficient performance gives rise to a “reasonable probability” that the result of the proceeding would have been different without counsel’s unprofessional errors. Id. at 688, 694, 104 S.Ct. 2052. Upon analyzing both the law and the facts in this case, we conclude that Appellant has failed to meet either of these requirements established by the Supreme Court.
In regard to the first prong of Strickland, we first note that Appellant was represented by two experienced military attorneys who devoted more than two years to preparing and presenting the defense in this case. With the benefit of appellate hindsight, we could dissect every move of these trial defense counsel and then impose our own views on how they could have handled certain matters differently and, perhaps, better. However, that is not the standard of review we are obligated to apply. Rather, based on long-standing precedent from the Supreme Court, we are required to be “highly deferential” in our review of counsel’s performance, and we must presume that counsel “rendered adequate assistance and made all significant decisions in the exercise of reasonable professional judgment.” Id. at 689, 690, 104 S.Ct. 2052. We also are constrained by the principle that strategic choices made by trial defense counsel are “virtually unchallengeable” after thorough investigation of the law and the facts relevant to the plausible options. Id. at 690-91, 104 S.Ct. 2052.
Concerning this last point, we are particularly mindful that many of the steps that were taken — or not taken — by trial defense counsel in the instant case, and that are now under scrutiny in this appeal, were the result of trial defense counsels’ strategic decision to conduct the case in a manner that avoided introduction of additional damaging information about Appellant. Specifically, trial defense counsel successfully sought to shield from the court-martial panel details about Appellant’s alleged stabbing of a military police officer (MP), just days before Appellant’s court-martial began. We conclude that trial defense counsel reasonably believed that the admission of such evidence would have seriously undermined their ability to convince the panel members during sentencing that Appellant had rehabilitative potential, and thus should not be sentenced to death. For this and other reasons discussed in greater detail below, we conclude that the performance of trial defense counsel was not “measurably below the performance standards ordinarily expected of fallible lawyers.” United States v. Davis, 60 M.J. 469, 474 (C.A.A.F.2005).
In regard to the second prong of the ineffective assistance of counsel test, several rea *372 sons convince us that there was no reasonable probability that the panel members would have acquitted Appellant or sentenced Appellant to something less than the death penalty had trial defense counsel presented their case in the manner now urged on appeal. First, Appellant’s murder of Army Captain (OPT) Christopher Seifert and Air Force Major (MAJ) Gregory L. Stone, and his attempted murder of other officers of the United States armed forces, was premeditated. Second, prior to committing this offense, Appellant had written incriminating passages in his diary, such as: “I may have to make a choice very soon about who to kill.... I will have to decide if I should kill my Muslim brothers fighting for Saddam Hussein or my battle buddies”; and, “I am not going to do anything about it as long as I stay here. But as soon as I am in Iraq I am going to kill as many of [my fellow servicemembers] as possible.” Third, Appellant committed this attack in Kuwait at the start of Operation Iraqi Freedom in an effort to hobble the American military’s ability to prevail in battle. Fourth, Appellant was thirty-one years old at the time he committed the offenses, had served in the United States Army for just under five years, and had attained the rank of sergeant. Fifth, both the sanity board and many of Appellant’s own experts concluded that Appellant was not suffering from a severe mental disease or defect at the time he committed the offense or at the time of testing. Sixth, Appellant was not intellectually deficient, as demonstrated by his engineering degree from a well-known university and his “extremely high, superior IQ.” And finally, even assuming that all of the information now provided by appellate defense counsel is true, we conclude that Appellant’s additional mitigation evidence is not sufficiently compelling to establish a substantial likelihood that the court-martial panel would have imposed a different sentence. See Cullen v. Pinholster, 563 U.S. 170, 131 S.Ct. 1388, 1410, 179 L.Ed.2d 557 (2011); see also United States v. Kreutzer, 61 M.J. 293, 300 (C.A.A.F.2005) (noting that “overwhelming evidence of guilt may present an insurmountable obstacle to an appellant claiming prejudice from ineffective assistance of counsel”). Based on these factors and others discussed below, we conclude that if there ever was a case where a military court-martial panel would impose the death penalty, this was it.
Since Appellant can establish neither deficient performance nor prejudice, we conclude that Appellant cannot prevail on his claims of ineffective assistance of counsel. We further conclude that Appellant’s other assignments of error are similarly without merit. Accordingly, we affirm the lower court’s decision.
I. Facts
A. The Offenses
In March 2003, soldiers from the 1st Brigade, 101st Airborne Division, were stationed at Camp Pennsylvania, Kuwait, preparing to begin Operation Iraqi Freedom. On the night of March 22, Appellant was guarding grenades with another soldier. When Appellant was left alone, he stole seven grenades: four M-67 fragmentation grenades and three M-14 incendiary grenades. The brigade was scheduled to cross the border from Kuwait into Iraq in the next few days.
Before movement and while most of the brigade slept, Appellant took a fellow soldier’s body armor and then walked to the tents of the brigade officers. He shut off the generator for the outdoor lighting to the tent area, plunging it into darkness. Appellant then threw one incendiary and one fragmentation grenade into Tent 1, where the brigade commander (Colonel (COL) Frederick Hodges), brigade executive officer (MAJ Ken Romaine), and brigade sergeant major (Command Sergeant Major (CSM) Bart Womack) were sleeping. When MAJ Romaine emerged from the tent, Appellant shot him, severely injuring, but not killing, him.
Appellant then moved to Tent 2 where several officers and two interpreters were sleeping and threw two fragmentation grenades into the tent. Many of the officers were injured from the shrapnel, and MAJ Gregory Stone was killed from eighty-three shrapnel wounds.
Appellant finally moved to Tent 3, which housed sixteen officers, and threw a fragmentation grenade into the tent, which injured multiple officers. When CPT Christo *373 pher Seifert exited the tent, Appellant shot him in the back at close range, causing CPT Seifert to bleed to death.
In the midst of the military’s response to the attacks, the brigade S-2, MAJ Kyle Warren, learned from COL Hodges that Appellant may have attacked Camp Pennsylvania. MAJ Warren found Appellant and tackled him to the ground. When MAJ Warren asked Appellant if he had attacked the tents, Appellant responded, “Yes.”
At the time of apprehension, Appellant was in possession of one fragmentation grenade and two incendiary grenades along with three empty incendiary grenade canisters. His weapon, an M-4 rifle, had been recently fired. Ballistics testing matched the bullets from Appellant’s firearm with those that had wounded MAJ Romaine and killed CPT Sei-fert. Appellant also had M-14 and M-67 grenade residue on his uniform and hands. His fingerprints were on the switch to shut off the generator.
B. The Trial Defense Team
Following the March 2003 Camp Pennsylvania attack, Appellant was initially represented by MAJ Daniel Brookhart, CPT David Coombs, CPT Jackie Thompson, and Lieutenant Colonel (LTC) Victor Hansen. Of these counsel, LTC Hansen was the most experienced because he had served as a trial counsel, senior trial counsel, and chief of military justice, as well as a professor of criminal law at what is now known as the Army Judge Advocate General’s Legal Center and School (LCS). He also had served as the lead trial counsel for a fact-finding hearing in a capital case, United States v. Murphy. Given this experience, LTC Hansen served as lead counsel.
Although LTC Hansen had the most capital experience among the group, the other counsel were also, well-qualified judge advocates. Because Appellant’s claims of ineffective assistance of counsel mostly concern MAJ Brookhart and CPT Coombs, we describe their qualifications in some detail.
MAJ Brookhart had served as a judge advocate for approximately eleven years before the pretrial hearings began for Appellant’s court-martial. He had earned a master of laws in military law from the LCS with a specialty in criminal law. MAJ Brookhart had tried seventy-five cases as trial counsel or senior defense counsel, including fifteen contested trials involving serious offenses. He had dealt with expert witnesses, including mental health experts. He had been a government appellate counsel for a year, during which time he attended the capital litigation course held by the Naval Justice School. He took this course so that he could handle the capital case of United States v. Kreutzer. He also had participated in the trial counsel assistance program which provided him with litigation training. Additionally, MAJ Brook-hart had served as branch chief at the government appellate division where he participated in strategy sessions for the Murphy capital case, and reviewed and edited the brief in the Kreutzer capital case. MAJ Brookhart had argued seven cases before this Court and seven eases at the CCA.
CPT Coombs had served as a judge advocate for approximately seven years before his appearance as counsel at Appellant’s pretrial hearing. During this time, CPT Coombs had served for more than two years as a trial counsel and for nearly four years as a defense counsel. CPT Coombs had tried seventy-eight cases, fifteen of which were contested. He had worked with expert witnesses, including forensic psychiatrists. CPT Coombs also had attended a week-long death penalty course in September 2003. In preparation for Appellant’s case, both counsel consulted capital resources to include motions in other capital cases, law review articles, and materials from a capital litigation course.
In addition to these two attorneys, the trial defense team also included a forensic psychiatrist, Dr. Walker, and a neuropsychologist, Dr. Clement, who both started working on the case in May 2003. Dr. Walker was used to assist the defense in understanding Appellant’s -mental status at the time of the crime and the trial, to help prepare a sentencing case, and to observe the Rule for Courts-Martial (R.C.M.) 706 board. Dr. Clement conducted neuropsychological tests on Appellant for the benefit of other defense experts. *374 A forensic DNA expert joined the defense team in June 2003 to observe Government testing of key evidence.
Initially the attorney workload was divided as follows. MAJ Brookhart focused on findings issues, CPT Coombs took the lead on motions, CPT Thompson contacted potential witnesses while deployed in Iraq, and LTC Hansen worked mitigation issues. The strategy was to use the services of a mitigation specialist, Ms. Deborah Grey, early in the process in order to uncover and develop information that could be used to avoid a capital referral and to submit an offer to plead guilty. LTC Hansen advised Appellant that an offer to plead guilty would be the best way to avoid a capital referral. On two occasions, Appellant agreed to this strategy, but he ultimately changed his mind.
In furtherance of the mitigation strategy, Ms. Grey began her work in August 2003 and was authorized to perform 400 hours of mitigation work. LTC Hansen and Ms. Grey traveled to Appellant’s childhood neighborhoods where they interviewed friends, family members, and associates, including Appellant’s childhood imam, Appellant’s brother, high school teachers and administrators, and college professors and administrators. Ms. Grey provided the defense team with detailed written summaries of these interviews and also collected school, medical, employment, military, and other official records.
Appellant’s mother, whom counsel described as having an emotional and mental influence over Appellant, did not agree with LTC Hansen’s strategies or the mitigation efforts. In December 2003, Appellant’s mother sent a letter to MAJ Brookhart,. informing him that she had asked her son to fire LTC Hansen and CPT Thompson because she did not trust them, in large part because they were encouraging Appellant to plead guilty. As a result, at his mother’s behest, Appellant released LTC Hansen, the defense’s most experienced capital litigator, as well as CPT Thompson, in January 2004.
To replace the dismissed military counsel, Appellant, with his mother’s encouragement, retained as lead counsel two civilian attorneys, Mr. Musa Dan-Fodio and Mr. Wazir Ali-Muhammad Al-Haqq, at different times in the pretrial proceedings. Neither attorney had capital litigation experience nor military justice experience. As the first civilian lead counsel, Mr. Dan-Fodio changed trial strategy to try to get Appellant’s case transferred to the United Nations Human Rights Commission or another international forum or, alternatively, to focus on self-defense, defense-of-othei’s, duress, and Appellant’s innocence.
Mr. Dan-Fodio subsequently withdrew from the ease and was replaced by Mr. Al-Haqq in the spring of 2004. This left Appellant with three counsel — Mr. Al-Haqq, MAJ Brookhart, and CPT Coombs. Mr. Al-Haqq became lead counsel and focused on an insanity defense. For this purpose, in June 2004, the defense team retained Dr. George Woods Jr., a neuropsychiatrist and forensic psychiatry expert. By this point, the defense team also had obtained the assistance of a ballistics and gunshot powder residue expert, a certified latent print examiner, and a pathologist to review physical and scientific evidence.
.Around the time Appellant retained Mr. Al-Haqq as lead counsel, Ms. Grey was informed in early May 2004 that her services as a mitigation specialist were no longer needed because Appellant’s mother refused to permit Ms. Grey to interview her or anyone else in her family. At the time of her withdrawal, Ms. Grey estimated that approximately 200 hours would be needed to complete the mitigation case.
In August 2004,. Mrs. Scharlette Holdman replaced Ms. Grey as the defense team’s mitigation specialist, and she was authorized to conduct seventy-five hours of interviews of Appellant’s family members. When Mrs. Holdman withdrew for medical reasons, Ms. Scarlet Nerad replaced her in September 2004. The Government authorized Ms. Ner-ad to conduct 368 hours of mitigation investigation and 198 hours of base-level investigation. Ms. Nerad interviewed Appellant, his father, mother, sisters, brother, half-brother, grandfather, aunts, uncles, and cousins. She also collected thousands of pages of documents, including court records, medical rec *375 ords of Appellant and his relatives, and education records of Appellant’s siblings. ■
When Mr. Al-Haqq stopped receiving payments from Appellant, he ceased working on the case in August 2004. He informed counsel he was withdrawing in late February 2005, but military counsel had anticipated this announcement and had worked to prepare Appellant’s case for trial accordingly. MAJ Brookhart and CPT Coombs were now left as Appellant’s trial defense counsel. By the start of the court-martial, the defense team already had managed to file nearly sixty motions on multiple topics, including many of the issues raised in this appeal.
C. Trial Proceedings
Following numerous continuances, Appellant’s trial was scheduled to begin on April 6, 2005, 744 days after Appellant’s attack on Camp Pennsylvania. However, on March 30, 2005, Appellant allegedly found a pair' of scissors in the office of the staff judge advocate and used them to stab an MP in the neck. Appellant also allegedly tried to seize the MP’s firearm before being subdued by another MP.[1] Following the incident, the military judge, upon trial defense counsels’ motions, reopened the R.C.M. 706 sanity board and preliminarily prevented the Government from referencing the stabbing incident. The sanity board deemed Appellant competent to stand trial.
Following the alleged scissors attack, trial defense counsel did not seek a delay in the start of the trial in a successful effort to preclude the Government from having the opportunity to refer additional charges against Appellant. Thus, trial proceedings began, as scheduled, on April 6, 2005. Twenty members were detailed to the venire pool. Following two days of voir dire, a fifteen-member panel consisting of nine officers and six enlisted soldiers was selected after the defense successfully challenged one member for cause and the Government successfully challenged three members for cause and used one peremptory challenge.
The Government’s case on the merits lasted four days and involved forty witnesses who mostly testified about the Camp Pennsylvania attack on March 22, 2003. When witnesses had information about Appellant, trial defense counsel cross-examined them, eliciting information about Appellant’s unfocused state in the period leading up to the attack, his daydreaming, his sleep problems and tendency to fall asleep at inappropriate times, his long periods of silence, his laughing and smiling without reason, and his tendencies to pace and talk to himself. Trial defense counsel also elicited through cross-examination that Appellant had heard ser-vicemembers joking about and using derogatory terms for Muslims.
Besides witness testimony, the Government’s case involved admission of these entries from Appellant’s diary:
I- may have not killed any Muslims, but being in the Army is the same thing. I may have to make a choice very soon about who to kill.
I will have to decide if I should kill my Muslim brothers, fighting for Saddam Hussein, or my battle buddies.
I’m hoping to get into a position so I don’t have to take any crap from anyone anymore.
For the defense case on the merits, counsels’ strategy was two-fold: (1) to present evidence establishing diminished mental capacity so as to raise doubt about Appellant’s ability to premeditate; and (2) to “frontload” mitigation evidence during the merits stage of the trial. As part of this strategy, trial defense counsel elicited testimony from nine defense witnesses.
Dr. Fred Tuton was a clinical psychologist who had examined Appellant at the age of fourteen after allegations surfaced about Appellant’s sister being sexually abused by Appellant’s stepfather. Dr. Tuton testified that Appellant displayed no normal emotions during the meeting and reported having sleep problems and not being able to trust people. Dr. Tuton diagnosed Appellant with an ad *376 justment disorder with depressed mood associated with a mixed specific developmental disorder.
Mr. Paul Tupaz, Appellant’s college roommate, testified about his friendship with Appellant which lasted until 1994. According to Mr. Tupaz,’ Appellant had difficulty sticking to his plans, was not very social and spent time by himself, “paced a lot,” talked to himself, and had difficulty sleeping.
Members of Appellant’s unit and unit leadership testified about Appellant’s poor work performance, his isolation from others, his pacing and talking to himself, his sleeping difficulties, and his laughing and smiling at inappropriate times. One servieemember testified about military personnel using derogatory names regarding Muslims in Appellant’s presence.
The testimony of Dr. Woods, Appellant’s expert in forensic psychiatry, revealed a family history of mental illness, particularly a maternal uncle with psychiatric problems, a father with depression, and a half-brother with paranoia. Dr. Woods explained that Appellant had come from an “extremely poverty-stricken home” and had an “extraordinarily abusive” stepfather. Additionally, he noted that Appellant’s mother had been homeless. Dr. Woods reported that test scores revealed Appellant to be suffering from depression, paranoia, impulsivity, sleep problems, and bizarre thinking, which Dr. Woods believed was corroborated by Appellant’s diary entries and academic history. Dr. Woods further testified that Appellant had difficulty picking up social cues, perceiving situations, and differentiating reality.
Although Dr. Woods could not provide a definitive diagnosis, he provided three “differential”[2] diagnoses: (1) schizotypal disorder; (2) schizophrenia paranoid type; and (3) schizoaffective disorder. Dr. Woods believed that Appellant’s symptoms affected him on March 22, 2003, by causing him to be overwhelmed emotionally and preventing him from thinking clearly.
In closing argument, trial defense counsel argued that the evidence showed that Appellant had a mental illness at the time the attack occurred, and that the Government had therefore failed to meet its burden of proving premeditation. Counsel explained that Appellant’s mental illness caused him to become emotionally charged, which in turn led Appellant to react out of confusion and fear. Throughout the closing, counsel argued that Appellant’s actions did not represent “good planning,” “just confusion.”
Despite the defense case and counsel’s closing argument, the panel members returned a guilty verdict on the premeditated murder and attempted murder charges. The case then moved to the sentencing phase.
The Government’s presentencing case lasted one-and-a-half days and included the testimony of twenty-one witnesses. COL Hodges, the brigade commander, testified about the impact of the attack on the brigade’s battle readiness. In response to a question about the psychological impact of Appellant’s attack, COL Hodges stated that he “hated” that a “fragging had occurred” in his unit, noting that in reflecting on the “worst days for the United States Army, at the end of Vietnam, the two things that [came] to mind [were] heavy drug use and fraggings.”[3]
Other servieemember victims testified about the impact of their injuries, the psychological impact of the attack, the impact on their military careers, their memories of the deceased victims, and their reactions upon learning that the attacks were by a fellow servieemember. As to this last point, the servieemember victims testified about feeling “disbelief,” “distrust,” “shock[ ],” “betrayed,” “[e]xtremely frustrated, angry,” “pissed,” and “confused.”
Colleagues of the victims also testified about feeling “anger,” “disbelief,” and “be *377 trayal” upon learning another servicemember was responsible. Finally, the deceased victims’ family members and Mends testified about the impact of losing CPT Seifert and MAJ Stone.
Prior to the start of Appellant’s presen-tencing ease, the defense admitted a,binder containing fifteen exhibits: (1) Appellant’s entire diary (313 pages); (2) the FBI’s written synopsis of the diary (nine pages); (3) Ms. Grey’s mitigation report showing Appellant’s family tree, Appellant’s personal history, and a summary of Appellant’s diary (thirty-three pages); (4) government records reflecting Appellant’s family’s use of food stamps from 1986-1994 (nineteen pages); (5) the search and seizure authorization for Appellant’s military e-mail account (one page); (6) definitions of relevant Islamic terms (eight pages); (7) Appellant’s paperwork for his name change (four pages);[4] (8) Ms. Grey’s interview notes from a high school guidance counselor (one page); (9) Ms. Grey’s interview note’s from a high school teacher (two pages); (10) Ms. Grey’s interview notes from the high school college ad-visor and photographs of the high school (six pages); (11) another mitigation specialist’s interview notes with the ex-wife of Appellant’s college roommate (two pages); (12) a memorandum from a servicemember in Appellant’s platoon (three pages); (13) a memorandum of the equal opportunity advisor for the brigade (four pages); (14) Ms. Grey’s interview notes with Appellant’s childhood imam and three photographs of Appellant’s childhood mosque (six pages); and (15) the criminal records for Appellant’s stepfather (four pages).
Before providing each member with a binder, the military judge instructed the members that once the trial recessed for the day, they would be provided defense exhibits to read at home or work. The military judge added that the members were not to conduct independent research, discuss the exhibits with anyone, or copy the exhibits.
The following morning, the defense presented its ease in mitigation. The defense presented testimony from CPT David Storch (one of Appellant’s former platoon leaders), SFC Daniel Kumm (the platoon sergeant for 2nd Platoon), and Mr. Dan Duncan (Appellant’s high school physics teacher). CPT Storch testified about Appellant’s termination from his platoon and Appellant’s problems as a noncommissioned officer (NCO), including difficulties relating well with soldiers, needing detailed guidance to perform tasks, and performing in an increasingly unsatisfactory manner over time. SFC Kumm testified about Appellant being a “below average” NCO, being a soldier he did not want to take to Iraq, and being assigned the task of guarding grenades on March 22, 2003, at Camp Pennsylvania in Kuwait. Mr. Duncan testified about the “very poor, low socioeconomic, high crime,” and gang-ridden area where Appellant’s high school was located. He described Appellant as an “excellent student” who was memorable for trying to learn material and being in “the top 5 to 10” students whom Mr. Duncan had ever taught at the high school. Mr. Duncan described Appellant as living in “a drab apartment building in a rather depressed area.” After Mr. Duncan’s testimony, the military judge recessed for the day “because of some witness travel schedules,” and for a second day he permitted the members to take the defense-created binders home with them.
On the final morning of the defense’s pre-sentencing case, the defense offered into evidence and distributed to the members copies of two statements: one from Ms. Regina Weatherford, Appellant’s former high school classmate, and one from Appellant’s brother. Ms. Weatherford’s statement described Appellant’s academic success in high school and his tendency to sit by himself during high school. The brother’s statement described how Appellant helped raise him, how Appellant financially helped the family, and how *378 Appellant had trouble falling in love too quickly with women. Defense counsel agreed with the military judge that they had decided for “sound tactical reasons” not to call Ms. Weatherford or Appellant’s parents to testify.
The final piece of Appellant’s sentencing case was his unsworn statement before the members of the court-martial panel. Appellant took the stand and explained that he had decided not to read the six-page statement that he previously had prepared because he felt that it sounded “like an excuse.” Instead, he said, “I want to apologize for the attack that occurred. I felt that my life was in jeopardy, and I had no other options. T also want to ask you to forgive me.”
During trial defense counsel’s sentencing argument, counsel emphasized that the Government’s argument was “based upon emotion,” and that emotion should not be used when deciding whether to impose the death penalty. He argued for life without parole “based upon logic and reason.” Counsel cited Appellant’s mental illness, noting that the diary provided “a unique look into [Appellant’s] mind.” Counsel also cited Appellant’s sleep problems as negatively affecting his ability to think. Counsel further noted the command’s responsibility, as part of a “band of brothers,” to ensure poor performers or those with mental illness did not deploy and did not remain as members of the Army. Counsel then cited Appellant’s difficult upbringing and school environment. Counsel ultimately returned to and emphasized Appellant’s mental illness as the cause of the lethal events at Camp Pennsylvania.
The military judge provided the panel members with instructions on the procedures that must be used during deliberations in capital cases. Specifically, the military judge instructed the members that in order for them to impose the death penalty: (1) they had to unanimously find beyond a reasonable doubt that an aggravating factor existed; (2) they had to unanimously find that the extenuating and mitigating factors were “substantially outweighed” by the aggravating circumstances; and (3) they had to reach the decision to impose death unanimously based on each member’s individual decision. The military judge listed thirty-one mitigating factors but explained that they were not the exclusive factors that the members could consider. Trial defense counsel explicitly stated that he did not object to these instructions.
The members then began their deliberations. Approximately six hours later, the military judge held an Article 39(a), UCMJ, 10 U.S.C. § 839 (2012), hearing to discuss this note from the members: “Sir, reconsideration has been proposed.” The military judge proposed to the parties that he use reconsideration instruction 2-7-19 from the Military Judges’ Benchbook (Benehbook), and. the parties agreed.[5] Appellant never raised an objection to the instruction. Following additional deliberations, the president of the panel announced that the members had unanimously determined that an aggravating factor had been proven beyond a reasonable doubt, and that the matters in mitigation and extenuation were “substantially outweighed” by the aggravating circumstances. The president then announced that the members had voted unanimously that Appellant should be “put to death.”
*379 II. Analysis
Appellant’s counsel has assigned a total of fifty-nine issues for this Court to consider. Appellant also has personally presented a number of additional matters for us to consider pursuant to United States v. Grostefon, 12 M.J. 431 (C.M.A.1982).[6] After careful review, we conclude that a majority of the assigned issues and all of the personally asserted issues do not have merit and therefore warrant no additional discussion. However, we deem it appropriate to address below twenty-one assigned matters, starting with Appellant’s ineffective assistance of counsel claims.
A. Ineffective Assistance of Counsel
Appellant challenges the effectiveness of trial defense counsels’ performance at all stages of the pretrial and trial proceedings.[7] We review these ineffective assistance of counsel claims de novo. See United States v. Datavs, 71 M.J. 420, 424 (C.A.A.F.2012). To prevail, Appellant “must show that counsel’s performance was deficient, and that the deficiency prejudiced the defense.” Wiggins v. Smith, 539 U.S. 510, 521, 123 S.Ct. 2527, 156 L.Ed.2d 471 (2003). An attorney is deficient when his representation falls “below an objective standard of reasonableness.” Id.
We do not measure deficiency based on the success of a trial defense counsel’s strategy, but instead examine “whether counsel made an objectively reasonable choice in strategy” from the available alternatives. United States v. Dewrell, 55 M.J. 131, 136 (C.A.A.F.2001) (quoting United States v. Hughes, 48 M.J. 700, 718 (A.F.Ct.Crim.App.1998)). Similarly, we must remain mindful that counsel have “wide latitude ... in making tactical decisions.” Pinholster, 131 S.Ct. at 1406 (quoting Strickland, 466 U.S. at 689, 104 S.Ct. 2052). Thus, our scrutiny of a trial defense counsel’s performance is “highly deferential,” and we make “every effort ... to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel’s challenged conduct, and to evaluate conduct from counsel’s perspective at the time.” Strickland, 466 U.S. at 689, 104 S.Ct. 2052.
An appellant is prejudiced by counsel’s deficient performance where “there is a reasonable probability that, but for counsel’s unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome.” Strickland, 466 U.S. at 694, 104 S.Ct. 2052. In the capital sentencing context, we “reweigh the .evidence in aggravation against the totality of available mitigating evidence” to determine if there is a reasonable probability that the panel would have returned a different sentence. Wiggins, 539 U.S. at 534, 123 S.Ct. 2527.
For ease of analysis, our discussion of Appellant’s ineffective assistance of counsel claims in the instant case is divided into four categories: (1) pretrial preparation; (2) merits phase performance; (3) penalty phase performance; and (4) cumulative error. As we explain in detail below, we conclude that none of these claims merits relief.
1. Pretrial Preparation
a.- Investigation
Trial defense counsel have “a duty to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary.” Strickland, 466 U.S. at 691, 104 S.Ct. 2052. “[Strategic choices made [by counsel] after thorough investigation of law and facts relevant to plausible options are virtually unchallengeable....” Id. at 690, 104 S.Ct. 2052. In *380 considering whether an investigation was thorough, “[w]e address not what is prudent or appropriate, but only what is constitutionally compelled.” Burger v. Kemp, 483 U.S. 776, 794, 107 S.Ct. 3114, 97 L.Ed.2d 638 (1987) (quoting United States v. Cronic, 466 U.S. 648, 665, 104 S.Ct. 2039, 80 L.Ed.2d 657 (1984)). The Supreme Court has “rejected the notion that the same [type and breadth of] investigation will be required in every case.” Pinholster, 131 S.Ct. at 1406-07 (citing Strickland, 466 U.S. at 691, 104 S.Ct. 2052).
i. Pretrial Interviews
A. Testifying Witnesses
Appellant claims that trial defense counsel failed to adequately interview and prepare two witnesses who testified at trial— Mr. Tupaz, Appellant’s college roommate, who testified during the merits phase, and Mr. Duncan, Appellant’s high school physics teacher, who testified during presentencing. Neither argument is persuasive.
The record reflects that trial defense counsel contacted Mr. Tupaz in the month prior to trial. In a post-trial affidavit, trial defense counsel reported interviewing Mr. Tupaz over the telephone and reviewing draft questions for trial preparation. In his post-trial declaration, Mr. Tupaz did not “remember talking to any defense attorneys prior to showing up” for the trial at which time Mr. Tupaz recalled speaking to trial defense counsel. We conclude that Mr. Tupaz’s inability to remember talking to trial defense counsel is “too equivocal and ambiguous to overcome the presumption that [Appellant’s] counsel were competent.” United States v. Key, 57 M.J. 246, 249 (C.A.A.F.2002). Even assuming trial defense counsel did not interview'Mr. Tupaz, counsel’s questioning of Mr. Tupaz during trial demonstrated that counsel was adequately prepared for his testimony. Therefore, it cannot be said that counsels’ performance was deficient in this regard.
Appellant now claims that Mr. Tupaz should have been asked to testify about the likelihood that Appellant took inappropriate comments made by members of the military about Muslims both very literally and personally. However, this proffered testimony was cumulative of Dr. Woods’s testimony on the same topic, and thus it would not have made Mr. Tupaz’s testimony more compelling in scope or degree.
As for Mr. Duncan, we accept Appellant’s claim that he was not interviewed by-defense counsel prior to trial. However, we note that trial defense counsel possessed the mitigation specialist’s report about her own interview of Mr. Duncan, which included facts and observations proffered by Mr. Duncan in regard to Appellant’s high school experiences. Further, trial defense counsel were able to elicit testimony from Mr. Duncan that Appellant’s high school was in a poor and dangerous neighborhood, Appellant was “an excellent student,” and Appellant lived in a “depressed area.” Mr. Duncan’s post-trial declaration contains no additional substantive information that he would have provided had counsel interviewed him prior to his testimony. Therefore, Appellant has not established a reasonable probability of a different sentence based on counsels’ failure to interview Mr. Duncan. We therefore reject Appellant’s ineffective assistance of counsel claims with respect to Mr. Tupaz’s and Mr. Duncan’s testimony.
B. Nontestifying Lay Witnesses
In the course of his ineffective assistance of counsel claims, Appellant complains that counsel failed to personally contact or to adequately interview his father, his brother, his sisters, his cousins, a high school friend, and a former landlady. In analyzing this issue, we first note that counsel must “investigate adequately the possibility of evidence that would be of value to the accused in presenting a case.” United States v. Boone, 49 M.J. 187, 196 (C.A.A.F.1998). Further, generally speaking, “[effective counsel will contact potential witnesses to determine the facts” of the case. United States v. Fluellen, 40 M.J. 96, 98 (C.A.A.F.1994). However, the duty to investigate does not require trial defense counsel to personally interview every potential witness in a case. See LaGrand v. Stewart, 133 F.3d 1253, 1274 (9th Cir.1998). For example, “there comes a point at which evidence from more distant relatives can rea *381 sonably be expected to be only cumulative” and “distract [counsel] from more important duties.” Bobby v. Van Hook, 558 U.S. 4, 11, 130 S.Ct. 13, 175 L.Ed.2d 255 (2009). As a result, the key point in deciding this issue is whether counsel made a good faith and substantive effort to identify those individuals who might be most helpful at trial, and to implement a means for obtaining information about and from these potential witnesses, thereby allowing counsel an opportunity to make an informed decision about their value for Appellant’s court-martial. Cf. Eggleston v. United States, 798 F.2d 374, 376 (9th Cir.1986) (noting that trial counsel need not interview a witness if the account is fairly known to counsel).
Trial defense counsel met this standard here. Specifically, counsel developed a strategy whereby a mitigation expert first interviewed potential witnesses and then provided counsel with a summary of their statements. For those family members with relevant information, one defense counsel would then conduct a phone interview to determine whether to select the person as a witness. There is nothing inherently deficient about this strategy.
The parties dispute whether trial defense counsel actually interviewed certain witnesses. For the sake of our analysis, we will assume that trial defense counsel did not personally conduct interviews of any of Appellant’s family members and friends. The record nonetheless indisputably reflects that LTC Hansen (when he was part of the defense team) and/or the mitigation specialists did interview those witnesses and then provided the defense team with summaries of those interviews. Those witnesses included Appellant’s father, brother, sisters, two cousins,[8] a high school friend, and former landlady. We conclude that these summaries allowed trial defense counsel to make informed decisions about whether to call these potential witnesses to testify at trial. Therefore, we do not find a sufficient basis to conclude • that they engaged in ineffective assistance of counsel.
C. Nontestifying Professional/Expert Witnesses
Appellant claims that trial defense counsel were ineffective in failing to interview or call to testify Dr. Donna Sachs, Appellant’s treating college psychologist, and Dr. Wilbert Miles, a clinical psychologist. At the outset, we note that “[i]t can be assumed that in some cases counsel would be deemed ineffective for failing to consult or rely on experts.” Harrington v. Richter, 562 U.S. 86, 106, 131 S.Ct. 770, 178 L.Ed.2d 624 (2011). However, that is not the case here.
The record demonstrates that trial defense counsel believed that a mitigation expert had coached or influenced Dr. Sachs’ memory of Appellant. Regardless of whether counsels’ belief was correct, trial defense counsels’ concern was reasonable. Therefore, we will not second guess counsels’ tactical decision in declining to rely on Dr. Sachs.
We also conclude that there was no deficiency in trial defense counsels’ decision not to rely on Dr. Miles despite his expertise in the special challenges faced by African American soldiers. See Richter, 562 U.S. at 107, 131 S.Ct. 770 (noting that counsel can formulate reasonable strategy even if it means ignoring experts “whose insight might possibly have been useful”). We note that trial defense counsel already had the assistance of other mental health professionals, including a neuropsychiatrist, a neuropsy-chologist, and a forensic psychiatrist. See United States v. Loving, 41 M.J. 213, 250 (C.A.A.F.1994), “The mere fact that [trial] defense counsel did not ‘shop around’ for another more favorable expert [did] not render them ineffective.” Poyner v. Murray, 964 F.2d 1404, 1419 (4th Cir.1992).
Moreover, even if counsel were deficient in not having Dr. Miles testify at trial, Appellant has not established any prejudice resulting from this assumed deficient per *382 formance. First, much of the information that would have been elicited from Dr. Miles was already obtained from Dr, Woods. Second, we recognize that Dr. Miles, unlike Dr. Woods, could have provided an opinion about “how someone from [Appellant’s] background and culture, presented with distress[ing] life experiences and [a] history of racial oppression, may have [developed] a state of mind that his own life was under imminent risk.” However, Appellant has not demonstrated that this information would have led to a different outcome on the merits or at-sentencing. We therefore find no merit to Appellant’s ineffective assistance claims based on counsels’ failure to rely on Dr. Miles or Dr. Sachs.
ii. Site Visits
Appellant asserts that trial defense counsel were deficient because they failed to travel to the locations where Appellant grew up, which he believes hindered them from properly interviewing witnesses and fully understanding Appellant. The premise of Appellant’s argument is flawed because the defense team did conduct site visits. Both LTC Hansen, the first lead counsel in this case, and the mitigation specialists made site visits to Appellant’s high school and his childhood neighborhoods, conducted interviews with Appellant’s acquaintances and family members, and summarized the interviews from these visits in memoranda used by the trial defense counsel. We conclude that trial defense counsel acted reasonably in opting not to repeat site visits performed by others on the defense team.
iii. Use of Mitigation Experts
Appellant next criticizes trial defense counsels’ use of the mitigation specialists in his case, pointing to counsels’ failure to follow all of their advice as well as the purported dysfunction in counsels’ relationship with them. In examining this issue, we first acknowledge the special importance of mitigation specialists in military justice capital cases. See Kreutzer, 61 M.J. at 298 n. 7, 302-03, 305. Without a “professional death penalty bar in the military services,” these specialists are likely “the most experienced member[s] of the defense team in capital litigation.” Id. at 298 n. 7. The mitigation specialists’ role is “to coordinate an investigation of the defendant’s life history, identify issues requiring evaluation by psychologists, psychiatrists or other medical professionals, and assist attorneys in locating experts and providing documentary material for them to review.” Id. at 302 (citation and footnote omitted). The specialists are considered “an indispensable member of the defense team throughout all capital proceedings.” Id. at 305 (citation omitted). As a result, “mitigation specialists may play a particularly important role in ensuring the fair and full adjudication of military death penalty cases where ... counsel have little training or experience in capital litigation.” Id. at 303.
In the instant case, however, we first conclude there is no basis to find counsel ineffective for failing to always follow the mitigation specialists’ advice. It is counsel, not mitigation specialists, who are entrusted with making strategic litigation decisions in each case. See Strickland, 466 U.S. at 689, 104 S.Ct. 2052 (noting “the constitutionally protected independence of counsel” and “the wide latitude counsel must have-in making tactical decisions”).
Second, for purposes of this appeal we will accept the premise that there was some dysfunction with and antipathy toward the mitigation specialists on the part of the trial defense counsel. But despite these problems, the various mitigation specialists employed in Appellant’s case performed extensive work and gathered significant information about Appellant’s background, upbringing, and related issues which the trial defense counsel effectively used in the preparation and presentation of Appellant’s ease. We particularly note the efforts of Ms. Grey, whose nearly 400 hours of mitigation work resulted in interviews, interview summaries, and thousands of pages of records which were provided to trial defense counsel. When Ms. Grey was fired by Appellant at his mother’s behest, Ms. Grey estimated that an additional 150 to 210 hours of work was needed *383 to complete the mitigation investigation. One of her successor mitigation specialists, Ms. Nerad, performed nearly three times this estimate by billing approximately 565 hours of work, which resulted in additional interviews, summaries, and records reviewed by trial defense counsel. Therefore, regardless of whatever dysfunction or antipathy might have existed, the mitigation specialists were able to adequately perform their - important role by providing trial defense counsel relevant and useful information in defending Appellant. See Kreutzer, 61 M.J. at 302. Trial defense counsel then used this information to defend Appellant both during the merits and penalty phases of the trial in questioning witnesses and presenting evidence.
Finally, trial defense counsel made a.reasonable strategic decision not to have a mitigation specialist testify or be physically present at Appellant’s trial. Although it may be advantageous to have a mitigation specialist actively participate at a capital trial, it is not required. See Kreutzer, 61 M.J. at 305. Moreover, the circumstances of this case demonstrate that counsel acted reasonably in deciding not to employ a mitigation specialist at trial. See Pinholster, 131 S.Ct. at 1406 (“No particular set of detailed rules for counsel’s conduct can satisfactorily take account of the variety of circumstances faced by 'defense counsel ....”) (quoting Strickland, 466 U.S. at 688-89, 104 S.Ct. 2052). The record demonstrates that the appointed mitigation specialist at the time of trial, Ms. .Nerad, disagreed with a number of approaches taken by trial defense counsel. Under these circumstances, trial defense counsel could reasonably conclude that the presence and participation of the mitigation specialist at trial would not have been beneficial. See id. at 1407 (noting that reviewing court must entertain the range of possible reasons for counsel’s decisions). Therefore, we find no basis to conclude that trial defense counsel were ineffective in the manner in which they used the mitigation specialists.
iv. Information to Dr. Woods
Appellant claims that trial defense counsel were ineffective for failing to provide Dr. Woods with certain information, including sufficient mitigation evidence and additional psychological testing data. Appellant asserts that this information would have allowed Dr. Woods to make a forensic diagnosis that Appellant suffered from schizophrenia and post-traumatic stress disorder.
However, even if we assume Dr. Woods received none of this material, we still find no demonstrated prejudice. First, even in the absence of additional information, Dr. Woods was able to provide the panel with “differential diagnoses” of schizotypal personality disorder, high functioning paranoid schizophrenia, and schizoaffective disorder. Dr. Woods opined that on March 22, 2003, Appellant’s symptoms, “played a great role in his mental state at the time of the offense” by “overwhelm[ing Appellant] emotionally and to really not think as clearly, to not really understand.” The post-trial affidavits do not demonstrate that Dr. Woods would have changed this opinion or strengthened it with additional information or testing.
Second, Dr. Woods testified that “it would really require appropriate treatment to really determine which of the three [differential diagnoses] would be accurate.” (Emphasis added.) This testimony indicates that Dr. Woods himself recognized that he could not have given a more definitive, diagnosis of Appellant, even with more testing and mitigation information.
Third, Dr. Woods downplayed the importance of a precise diagnosis, stating: (1) “The fact that it may not be called schizophrenia or what have you is, in the long run, less important_and (2) “The fact that it’s not — it may not be called schizophrenia is not clinically relevant.” As can be seen then, Dr. Woods’s testimony emphasized Appellant’s symptoms and minimized the importance of a precise diagnosis. Under these circumstances, we conclude that Appellant has not demonstrated any likelihood of a different outcome in this case even if trial defense counsel had provided additional information or testing data to Dr. Woods.
b. Additional Funding and Continuances
Appellant claims that trial defense counsel were ineffective for failing to request *384 additional funding and for failing to seek a continuance at two separate points before trial — following the mitigation specialist’s request in early March 2005, and following Appellant’s alleged stabbing of the MP in late March 2005. We first reject this argument because Appellant has not carried “his burden to show that his counsel would have been successful if he had filed ... timely motion[s]” for a continuance and additional funding. United States v. Jameson, 65 M.J. 160, 164 (C.A.A.F.2007). Simply stated, there is no “reasonable probability that [the] motion[s for a continuance and additional funding] would have been [deemed] meritorious” by the military judge. Id. at 163-64 (quoting United States v. McConnell, 55 M.J. 479, 482 (C.A.A.F.2001)). These motions would have come a few days before and one month before the start of trial, respectively, and after the military judges in this case already had granted three prior continuances in a case that was originally scheduled for trial in July 2004. Given the late requests and this record of delay, which totaled more than 700 days after the Camp Pennsylvania attack, there is an insufficient basis for us to conclude that the military judge likely would have granted additional continuances, see United States v. Wiest, 59 M.J. 276, 279 (C.A.A.F.2004) (listing factors relevant for continuance), or additional funding, see United States v. Garries, 22 M.J. 288, 291 (C.M.A.1986) (requiring showing of why request for funds was needed).
We next observe that Appellant has not adequately demonstrated that additional time or funding in early March 2005 would have resulted in a more favorable outcome in the proceedings. Specifically, Appellant has not demonstrated that additional investigation would have resulted in a substantively different or enhanced mitigation posture at trial, particularly where approximately 1,000 hours of investigation already had been devoted to this case. Accordingly, Appellant has not established that counsel were ineffective for failing to request additional funds or a continuance in early March 2005.
In regard to late March 2005, we also conclude that counsel were not ineffective for deciding not to seek a continuance after the March 30, 2005, stabbing of the MP. The record is clear that trial defense counsel made the strategic calculation that a delay in the courbmartial would provide the Government with an opportunity to charge Appellant with the assault on the MP. Evidence admitted at trial in support of this additional . specification likely would have greatly undermined the defense position that Appellant’s prior violent conduct was aberrational and that Appellant had rehabilitative potential. Therefore, we do not conclude that trial defense counsel were ineffective for deciding not to seek a continuance at that point in the proceedings.
c. Special Instruction Regarding Guilty Pleas
Appellant contends that his trial defense counsel were ineffective for failing to seek a mitigation instruction concerning Appellant’s inability to plead guilty.[9] Indeed, we note that before trial began, trial defense counsel withdrew a requested instruction informing the members that because this matter had been referred as a capital case, Article 45, UCMJ, 10 U.S.C. § 845 (2012), required Appellant to plead not guilty and be tried before members. However, the record shows that trial defense counsel acted entirely reasonably in obtaining the withdrawal of this instruction for the simple reason that Appellant had decided not to submit an offer to plead guilty and instead had decided to argue at trial that he had not premeditated the attacks. Therefore, we conclude that trial defense counsel were not ineffective for withdrawing the instruction.
d. Voir Dire
Appellant challenges trial defense counsels’ use of an “ace of hearts” strategy *385 during the voir dire process.[10] An ace of hearts strategy is predicated on the fact that in order for a panel to impose a death sentence, the members must vote unanimously to impose that sentence. See R.C.M. 1006(d)(4). Therefore, the strategy posits that the accused will benefit from having the largest possible number of panel members because that will increase the chances that at least one member of the panel (the so-called “ace of hearts”) will vote for a sentence other than the death penalty. In furtherance of this strategy, trial defense counsel in the instant ease made the strategic decision to minimize their use of peremptory challenges and challenges for cause.
It may be argued that the ace of hearts strategy ignores panel dynamics whereby vocal and opinionated members hostile to the defense position may disproportionately impact deliberations.[11] However, in light of the fact that trial defense counsel consulted with other experienced attorneys and relied on an appellate military judge’s concurring opinion in United States v. Simoy, 46 M.J. 592, 625 (A.F.Ct.Crim.App.1996) (Morgan, J., concurring), rev’d in part on other grounds by 50 M.J. 1 (C.A.A.F.1998), before deciding to employ this strategy, we conclude that their decision is “virtually unchallengeable.” United States v. Curtis, 44 M.J. 106, 119 (C.A.A.F.1996) (quoting Strickland, 466 U.S. at 690, 104 S.Ct. 2052).[12] Therefore, we conclude that there was no ineffective assistance of counsel.
2. Merits Phase
Appellant claims that trial defense counsel were ineffective for conceding guilt in opening statement, during the defense case on the merits, and in closing argument. However, Appellant’s assertions are misplaced because trial defense counsel never conceded that Appellant was guilty of premeditated murder, only that he had committed certain acts.
To be blunt, there was absolutely overwhelming evidence adduced at trial that Appellant committed the acts that resulted in the deaths of MAJ Stone and CPT Seifert, and the wounding of fourteen other military officers. Therefore, it was not unreasonable for trial defense counsel to forego trying to convince the court-martial panel to the contrary, and to instead focus squarely on trying to persuade the panel members that Appellant’s acts were not premeditated. Accordingly, concessions such as the ones made by trial defense counsel that Appellant “threw those grenades” and “shot and killed Captain Seifert” were not unreasonable because they did not concede Appellant’s guilt to capital murder. Indeed, this type of approach is a well-recognized defense strategy in capital cases. See Florida v. Nixon, 543 U.S. 175, 190-91, 125 S.Ct. 551, 160 L.Ed.2d 565 (2004); Lingar v. Bowersox, 176 F.3d 453, 458-59 (8th Cir.1999) (holding that concession of elements of second-degree murder to challenge defendant’s mens rea for a capital-murder conviction was not constitutionally deficient where overwhelming evidence pointed to defendant as perpetrator). Accordingly, we conclude that trial defense counsel were not ineffective in this regard.
3. Penalty Phase
Appellant describes trial defense counsels’ presentencing presentation as consisting of “[t]hirty-eight minutes [of testimony and Appellant’s unsworn statement] and a document dump.” Specifically, he criticizes the performance of trial defense counsel for failing to develop a coherent mitigation theme, submitting his entire diary for the panel’s review, and presenting a mitigation case pri- *386 mainly through documents instead of live witness testimony.
In closely analyzing this issue, we acknowledge at the outset that trial defense counsel may well have presented a stronger case in mitigation if they had adopted a different approach and taken different steps during the pfesentencing phase of this court-martial. However, in determining whether there was ineffective assistance of counsel, we do not assess trial defense counsels’ performance through the prism of appellate hindsight and then apply our subjective view of how we think defense counsel should have conducted the trial. Rather, pursuant to Supreme Court precedent, we are obligated to determine ' whether trial defense counsels’ performance fell below an “objective standard of reasonableness” and, if so, whether there was a “reasonable probability” that the result of the proceeding would have been different absent counsels’ deficient performance. Strickland, 466 U.S. at 688, 694, 104 S.Ct. 2052. In the instant case, not only do we conclude that trial defense counsels’ performance was not “measurably below the performance standards ordinarily expected of fallible lawyers,” Davis, 60 M.J. at 474, we also conclude that even if trial defense counsel had handled the mitigation case precisely as appellate defense counsel now avers they should have, there is no reasonable probability that the court-martial panel would have imposed a lesser sentence. See Loving v. United States, 68 M.J. 1, 7 (C.A.A.F.2009). Accordingly, for the reasons cited in greater detail below, we disagree with Appellant’s assessment of this issue.
a. Mitigation Theme
Appellant argues that trial defense counsel failed to develop a comprehensive and compelling mitigation argument encompassing Appellant’s upbringing in accordance with the tenets of- the Nation of Islam, his need to overcome great disadvantages as a youth, and his continued willingness to provide love and support to his family. We recognize that counsel are well advised to adopt a coherent defense theme and strategy throughout a trial. Curtis, 44 M.J. at 120, However, there are a number of acceptable ways to establish, develop, and present such a theme in any given case. See Pinholster, 131 S.Ct. at 1407.
In the instant case, the record reflects that trial defense counsels’ mitigation strategy was to emphasize Appellant’s mental illness while also pointing out Appellant’s difficult upbringing, his lack of ties to radical Islamic groups, and the Army leadership’s questionable decision to bring Appellant to Kuwait despite signs of mental illness and poor NCO skills. The evidence that supported these arguments was .developed during both the merits[13]. and penalty phases of the trial. Because trial defense counsels’ decision about how best to handle the sentencing argument followed an extensive mitigation investigation and exploration of other possible approaches, Appellant’s criticism amounts to a dispute over counsels’ strategy. See United States v. Gray, 51 M.J. 1, 19 (C.A.A.F.1999) (characterizing argument about counsels’ failure to present an “adequate sentencing case” as an attack on “strategy and tactics”). Under such circumstances, Appellant has not established that trial defense counsels’ selection *387 and presentation of a mitigation theme constituted ineffective assistance of counsel.
b. Submission of the Diary-
Appellant argues that trial defense counsel were ineffective for submitting the entirety of Appellant’s “damning” diary into evidence at sentencing because it led to the introduction of aggravating evidence, not mitigating evidence. However, upon closely analyzing this issue, we find there is an insufficient basis to conclude that trial defense counsel provided ineffective assistance of counsel.
To be clear, we fully recognize that some of the entries contained in the diary introduced by the defense were, indeed, damning. However, we are also mindful of the fact that when counsel made the decision to introduce the entire diary, the Government already had presented to the panel some of its most damaging portions. For example, the Government' introduced the following two passages: “[A]s soon as I am in Iraq I am going to try to kill as many [fellow soldiers] as possible”; and “I may have to make a choice very soon about who to kill.... I will have to decide if I should kill my Muslim brothers fighting for Saddam Hussein or my battle buddies.” These portions, along with others introduced to the panel upon admission of the entire diary, underscored Appellant’s premeditation. However, it is important to note that at the time of the diary’s admission, the members had already found premeditation during the merits phase, and the existence or degree of premeditation was not at issue during sentencing. Therefore, the record indicates not only that trial defense counsel reasonably concluded that additional passages in the diary would not inflict any more damage on the defense than those already selected by the Government, but that they also reasonably concluded that the diary in its entirety would paint a persuasive portrait of a mentally ill man who could not control his thought processes or his actions in the period leading up to the Camp Pennsylvania attack.[14] Therefore, we conclude that trial defense counsel were well aware of the inflammatory nature of portions of the diary, yet made a strategic decision to submit the diary in its entirety. In doing so, we note that generally speaking, we ‘“will not second-guess the strategic or tactical decisions made at trial by defense counsel.’ ” United States v. Mazza, 67 M.J. 470, 475 (C.A.A.F.2009) (quoting United States v. Anderson, 55 M.J. 198, 202 (C.A.A.F.2001)). Indeed, we decline to do so here.
Appellant further claims that even if it was a reasonable strategic decision to. admit the diary as a whole, witness testimony was needed to place the diary entries into proper perspective. The record shows, however, that counsel did contextualize the diary through Dr. Woods’s testimony, as well as through the FBI analysis of the diary and Ms. Grey’s analysis of the diary, which were submitted to the panel members as evidence. Also, counsels’ sentencing argument emphasized that the diary provided an important glimpse into Appellant’s mental state and that it showed the facts and effects of Appellant’s difficult upbringing. Moreover, with the diary’s admission, counsel was able to argue at sentencing that despite the conflict between the mental health experts as to a specific diagnosis, the diary showed that Appellant suffered from a profound mental illness when he committed the offenses, which warranted a sentence of life imprisonment rather than the death penalty. Given these circumstances, we conclude that counsels’, performance was not deficient.
c. Mitigation Primarily Through Documents
Appellant claims that trial defense counsel were ineffective because they pre *388 sented Appellant’s mitigation case primarily through documents instead of through live testimony by family and friends. However, we disagree with Appellant’s initial premise that the mitigation case consisted only of thirty-eight minutes of testimony and a “document dump.” The record shows that trial defense counsel actually began developing the mitigation case during the merits phase of the trial. They did so through the testimony of the expert witnesses, members of Appellant’s unit, and Appellant’s college roommate. This evidence covered Appellant’s troubled upbringing, his strange behavior, his tendency to spend time alone, his poor skills as an NCO, his symptoms of mental illness, and his mental illness diagnoses. Once the merits phase ended, counsel did not ignore this evidence but instead built upon it during the presentencing phase and relied upon it during the sentencing arguments. Therefore, we conclude that trial defense counsel presented a more substantial and thoughtful mitigation case at trial than Appellant now claims on appeal.
We also disagree with Appellant’s criticism of trial defense counsels’ decision to present mitigation evidence primarily through documents rather than through live testimony. In examining this issue, we view it as an essential fact that trial defense counsels’ presentation was greatly affected by Appellant’s alleged stabbing of an MP just days before the court-martial began. In light of this incident, trial defense counsel made a strategic decision to be very cautious about taking any steps that could be used by the Government to introduce evidence of this uncharged misconduct in the course of the trial. Trial defense counsel were successful in this effort, and we deem their approach to be a reasonable and appropriate one. See American Bar Association Guidelines for the Appointment and Performance of Defense Counsel in Death Penalty Cases (ABA Guidelines) 10.11.G, reprinted in 31 Hofstra L.Rev. 913, 1056-57 (2003) (noting that “[i]n determining what presentation to make concerning penalty, counsel should consider whether any portion of the defense case will open the door to the prosecution’s, presentation of otherwise inadmissible aggravating evidence”). Any one of the witnesses who might have been called to testify by the defense could have unintentionally opened the door to evidence about the MP stabbing by, for example, testifying about their belief that Appellant’s actions at Camp Pennsylvania were out of character. Therefore, trial defense counsel reasonably concluded that they should limit the number of defense witnesses both because they posed a danger to Appellant’s case and because, if they did testify, their testimony would be so circumscribed that -whatever value they otherwise would have had for the defense would be substantially diminished. See Cone, 535 U.S. at 700-01, 122 S.Ct. 1843 (finding state court’s application of Strickland was not unreasonable with respect to failing to call other witnesses where “counsel feared that the prosecution might elicit information about [the defendant’s] criminal history”); Burger, 483 U.S. at 792, 107 S.Ct. 3114 (concluding decision not to present character witnesses not unreasonable where prior convictions might have been introduced on cross); Tinsley v. Million, 399 F.3d 796, 809-10 (6th Cir.2005) (noting no testimony may be better than some testimony “given the risk that every positive argument by a defendant potentially opens the door to a more-harmful response”).
We also conclude that trial defense counsel did not merely “dump” a bunch of documents on the panel. Counsel reviewed and selected relevant documents for the members to consider, which were presented to each member in a binder. Among the documents submitted to the members were those that provided important context for, and useful summaries of, Appellant’s diary.
The military judge implicitly instructed the members that they were required to review the documents in the binders. For instance, the military judge instructed the members prior to disseminating the binders as follows:
The defense has requested, the government does not oppose, and I’m going to allow you to take several defense exhibits with you when we recess for the day in a few moments. They are in the black binders in front of you. The exhibits contain a *389 lot of material, and it will help if you have read through the documents before the defense calls its witnesses starting tomorrow. Since counsel estimate it may take some time to do so, rather than require you to read it in open court, which is what would normally happen, I’m going to let you read it at home or work.
A couple cautionary instructions however. You are only to read the exhibits. Please do not conduct any independent research based on anything you may read. Also, please, do not discuss the exhibit with anyone, to include friends and family members, or yourselves. You can only discuss the exhibits with each other once you begin your formal deliberations, which probably won’t happen until Thursday. Also do not copy the exhibits or let anyone else read them. And please bring them back with you when you return to court tomorrow morning....
This instruction informed the members of their duty to review the exhibits in two ways. First, the military judge told the members, “rather than require you to read [the evidence] in open court, which is what would normally happen,” they were being permitted to “read it at home or work.” (Emphasis added.) Second, the military judge told the members they were “only to read the exhibits” instead of discussing them or performing research. (Emphasis added.) ' These facets of the instruction had the effect of notifying the members that they had to review Appellant’s documentary evidence.
The military judge reiterated the members’ duty to review the defense exhibits when he allowed the members to take the binders home for a second day, stating: “[Y]ou should be able to take them with you for the rest of the day if you need more time to review the documents.” (Emphasis added.) By informing the members that they had more time to review the documents, the military judge again signaled to the members that they were expected to review all the evidence.[15] The record does not reveal that the members disobeyed the military judge’s instructions, so we presume that the members followed them. See United States v. Stewart, 71 M.J. 38, 42 (C.A.A.F.2012). We therefore conclude that the members were aware of their duty to review, and did in fact review, the evidence submitted to them in the binders.
Counsels’ sentencing argument then explained the purpose of the diary by asserting that it provided a “unique” look into Appellant’s troubled mind. This is hardly a case in which counsel obtained records and “then dump[ed] the whole file in front of the jury without organizing the files, reading them, eliminating irrelevant files or explaining to the jury how or why they are relevant.” Johnson v. Bagley, 544 F.3d 592, 602 (6th Cir.2008). Accordingly, we do not see a sufficient basis to conclude that trial defense counsels’ method of introducing the documents was deficient.
Appellant insists that the live testimony of family members and friends, not submission of documents, was needed to present all the available mitigation evidence to counter the Government’s aggravation evidence. He further argues that trial defense counsels’ failure to present this evidence constituted an incomplete and incompetent defense.
*390 To be sure, “evidence about [an accused’s] background and character is relevant because of the belief, long held by this society, that [those accused] who commit criminal acts that are attributable to a disadvantaged background, or to emotional and mental problems, may be less culpable than [those] who have no such excuse.” Loving, 68 M.J. at 15 (quoting Boyde v. California, 494 U.S. 370, 382, 110 S.Ct. 1190, 108 L.Ed.2d 316 (1990)). Here, however, trial defense counsel did not ignore Appellant’s social history. They introduced evidence about Appellant’s abusive stepfather through the testimony of Drs. Tuton and Woods. Further, through testimony, a declaration from Appellant’s brother, and the mitigation specialist’s interview notes, they introduced evidence about Appellant growing up in impoverished circumstances and living and going to school in dangerous neighborhoods. And through Appellant’s diary, trial defense counsel also introduced evidence of Appellant’s adverse upbringing. Finally, the exhibits submitted by trial defense counsel at sentencing contained information that humanized Appellant such as the diary entries that detailed assistance to his family and listed his goals of assisting his family and his community, the interview summaries of Appellant’s teachers that described his work ethic and politeness, the statement from Appellant’s brother that recounted Appellant’s financial support, and the interview summary from Appellant’s childhood imam that described Appellant’s lack of aggression. Therefore, there is an insufficient basis to conclude that trial defense counsel needed additional live testimony in order to present key points of their mitigation case.
The record also reveals that counsel did not act unreasonably in choosing not to present live testimony from Appellant’s father, brother, sisters, cousins, high school friend, and former landlady. A trial defense counsel’s decision on whether to call a witness is a tactical decision. See United States v. Anderson, 55 M.J. 198, 202 (C.A.A.F.2001); Fluellen, 40 M.J. at 98 (noting part of the tactical decision in the case was deciding what witnesses not to call). In this case, trial defense counsel made an informed tactical decision, after a reasonable investigation, when selecting trial witnesses. See Wiggins, 539 U.S. at 533-34, 123 S.Ct. 2527. Therefore, for this reason and for the additional reasons cited below, we conclude that Appellant has not provided us with a sufficient basis to question trial defense counsels’ tactical decisions regarding these witnesses.
First, trial defense counsel had interactions with Appellant’s father prior to trial and obtained additional information about his background through the mitigation expert’s report. They therefore assessed his likely manner of presentation as a witness, and learned of his significant criminal background, history of drug use, and impaired cognitive abilities. See Pinholster, 131 S.Ct. at 1407 (noting that in applying strong presumption of competence, court is required to affirmatively entertain range of possible reasons for counsel’s performance). Upon doing so, counsel explicitly informed the military judge that they had made an informed, conscious, and strategic decision not to have Appellant’s father testify during sentencing. See Lord v. Wood, 184 F.3d 1083, 1095 n. 8 (9th Cir.1999). We see no basis to question this decision.
Appellant claims that his father would have served as a valuable witness to document “the prejudices the Nation of Islam instilled in” Appellant. Indeed, trial defense counsel could have employed this strategy of eliciting testimony on this point. However, they chose a different strategy, one that described Appellant as not being “hate-filled” but “a person with mental illness, who is very sensitive to anything said to him.” In fact, trial defense counsels’ affidavit explains that they wanted to downplay Appellant’s link to the Nation of Islam because it would “likely ... carry strong negative connotations with the panel members,” which ultimately would harm Appellant’s defense. Additionally, counsel chose not to portray Appellant as a hate-filled person since childhood because this approach would have conflicted with their strategy of portraying Appellant’s actions on March 22, '2003, as aberrational and not premeditated, and because it would have undermined their position that Appellant had *391 rehabilitative potential. We therefore do not find a basis to question counsels’ tactical decision not to call Appellant’s father to testify-
Second, we conclude that counsel was not deficient in presenting the declaration of Appellant’s brother at trial rather than having the brother testify. Although the brother now claims that he was willing and able to testify at Appellant’s trial, the brother’s April 26,2006, trial declaration stated that he could not leave his wife’s side due to the birth of a child. Additionally, we conclude there is no additional information in the brother’s post-trial one-page declaration that reasonably could be considered powerful mitigation evidence. We do not consider counsels’ failure to call Appellant’s brother as a witness to be deficient performance under these circumstances.
Third, the record reflects that trial defense counsel had the mitigation specialists’ interview summaries for Appellant’s sisters, his cousins, a high school friend, and his former landlady. With this information, trial defense counsel made an informed decision not to call these witnesses, and we do not find a sufficient basis to second-guess that decision. Cf. Lema v. United States, 987 F.2d 48, 54 (1st Cir.1993) (noting that “decision whether to call a particular witness is almost always strategic, requiring a balancing of the benefits and risks of the anticipated testimony”).
We finally conclude that even if trial defense counsels’ mitigation presentation was deficient, Appellant has not established prejudice. This inquiry asks “whether if the members had been able to place the additional evidence ‘on the mitigating side of the scale, there is a reasonable probability that at least one [member] would have struck a different balance.’” Loving, 68 M.J. at 7 (quoting Wiggins, 539 U.S. at 537, 123 S.Ct. 2527). The new mitigating evidence “must differ in a substantial way — in strength and subject matter — from the evidence actually presented at sentencing.” Id. at 16 (quoting Hill v. Mitchell, 400 F.3d 308, 319 (6th Cir.2005)). Appellant has not met this standard.
The additional post-trial evidence in this case can generally be placed into one of seven categories: Appellant’s parents’ backgrounds, the history of family mental illness, Appellant’s challenging upbringing and his positive qualities as a child, the influence on Appellant of the Nation of Islam, Appellant’s high school experience, Appellant’s attempt to repay a debt, and the impact of Appellant’s execution on his family. Many of these areas were presented at trial, including information about Appellant’s upbringing and positive qualities, his high school experience, and the existence of mental health issues in the family. While some of the post-trial information may be viewed as elaborating on these points, there is not a sufficient basis to conclude that this information was different in quality or substance from what the members actually considered. Therefore, we consider it to be “largely cumulative.” See Loving, 68 M.J. at 16.
We recognize that the material submitted by Appellant post-trial includes information in four areas that were not addressed at the court-martial. However, we conclude that Appellant was not prejudiced by counsels’ failure to present this evidence. First, trial defense counsel concluded that the role of the Nation of Islam in Appellant’s life represented a “double-edged sword” in that any mitigation effect of this information may have been outweighed by the extent to which it alienated the panel and undermined trial defense counsels’ theory that Appellant’s attack was due to mental illness and was not the product of hatred and premeditation. Cf. Wiggins, 539 U.S. at 535, 123 S.Ct. 2527 (noting that limited investigation justified where defendant’s history was “double-edged”). Second, Appellant’s attempt to repay his landlady long after she expected him to, although a positive story, certainly is not “sufficiently compelling” to establish prejudice given Appellant’s crimes and their impact on the victims. See Loving, 68 M.J. at 17. Third, although the post-trial evidence demonstrates that Appellant’s parents’ had challenging upbringings, Appellant does not explain why this information would prove compelling to the panel members as they decided the appropriate sentence to impose on Appellant.
*392 Finally, we recognize the potential mitigating value of Appellant’s family members expressing opinions about the impact Appellant’s death sentence would have on his family. We do not seek to minimize the importance of such testimony in capital cases. However, in the instant ease, there is an insufficient basis to conclude that the panel’s knowledge of this information would have changed the result of the proceeding given the aggravating circumstances. Moreover, trial defense counsel had to weigh whether such testimony would have alienated the panel members in light of the fact that Appellant’s murderous actions had so tragically and irrevocably affected the families of the victims of Appellant’s attack. Accordingly, we conclude that Appellant has not met his burden of establishing that he was prejudiced by counsels’ submission of documents instead of live witness testimony.
4. Cumulative Error
We next consider whether trial defense counsels’ conduct, examined in its totality, constituted ineffective assistance of counsel even if individual oversights or missteps did not independently rise to that level. Loving, 41 M.J. at 252; see also United States v. Dado, 759 F.3d 550, 563 (6th Cir.2014). As shown above, for the vast majority of Appellant’s individual ineffective assistance of counsel claims, there is an insufficient basis to conclude that trial defense counsel acted unreasonably. These claims do not provide a basis for establishing ineffective assistance of counsel based on cumulative error. See United States v. Hall, 455 F.3d 508, 520 (5th Cir.2006) (stating that “ineffective assistance of counsel cannot be created from the accumulation of acceptable decisions and actions”); Campbell v. United States, 364 F.3d 727, 736 (6th Cir.2004); Hough v. Anderson, 272 F.3d 878, 907 n. 14 (7th Cir.2001). In those few instances where we assumed otherwise, we found no prejudice. Even considering these instances of assumed deficient performance in the aggregate, we conclude that they do not establish prejudice at the findings phase or- penalty phase of the trial. Therefore, we conclude that Appellant has not provided us with a sufficient basis to apply the cumulative error doctrine to the circumstances of his ease, and we decline to find ineffective assistance of counsel on the basis of this doctrine. See Becker v. Luebbers, 578 F.3d 907, 914 n. 5 (8th Cir.2009) (noting that even if some aspect of counsel’s performance was deficient, prejudice must be limited to constitutionally defective aspects of representation).
B. DuBay Hearing
Appellant asserts that, at a minimum, we should order a post-trial fact-finding hearing in this case under United States v. DuBay, 17 C.M.A. 147, 37 C.M.R. 411 (1967). Our decision in United States v. Ginn, 47 M.J. 236 (C.A.A.F.1997) sets forth the proper standard to determine whether a DuBay hearing is necessary to resolve ineffective assistance of counsel claims. We have considered the five Ginn factors[16] and conclude that the issues in this case can be resolved on the record before us and without a DuBay hearing.
C. Victim-Impact Presentation
Appellant challenges two aspects of the Government’s victim-impact presentation. First, he contends that presentencing testimony from Government witnesses violated the Eighth Amendment. Second, he challenges the propriety of trial counsels’ sentencing argument. In making these claims, Appellant correctly concedes that his trial defense counsel did not raise objections to the witness testimony or to the trial counsels’ argument during the court-martial. Therefore, we note that he has “forfeit[ed] appellate review of [these issues] absent plain error.” United States v. Eslinger, 70 M.J. 193, 197-98 (C.A.A.F.2011); see also United States v. Frey, 73 M.J. 245, 247 n. 1 (C.A.A.F.2014) (sentencing argument); United States v. Holt, 33 M.J. 400, 408-09 (C.M.A.1991) (victim-impact testimony). To *393 prevail under the plain error standard, Appellant has the burden of “establishing (1) error that is (2) clear or obvious and (3) results in material prejudice to his substantial rights.” United States v. Knapp, 73 M.J. 33, 36, reconsideration denied, 73 M.J. 237 (C.A.A.F.2014).
We conclude that Appellant fails to meet the first prong of the plain error standard. Victim impact testimony is admissible in capital eases to inform the panel about “the specific harm caused by the [accused].” Payne v. Tennessee, 501 U.S. 808, 825, 111 S.Ct. 2597, 115 L.Ed.2d 720 (1991); United States v. Wilson, 35 M.J. 473, 476 n. 6 (C.M.A.1992). Trial counsel may elicit evidence about (1) the victim’s personal characteristics or (2) the emotional impact of the murder on the victim’s family. See Payne, 501 U.S. at 827, 111 S.Ct. 2597. What is not permitted is evidence or argument about the family members’ “opinions and characterizations of the crimes,” the defendant, or the appropriate sentence. See Booth v. Maryland, 482 U.S. 496, 508-09, 107 S.Ct. 2529, 96 L.Ed.2d 440 (1987), overruled on other grounds by Payne, 501 U.S. at 830 n. 2, 111 S.Ct. 2597. Examples of this type of impermissible victim-impact evidence include: an opinion from the victim’s family members that the victims were “butchered like animals”; a statement that the witness “doesn’t think anyone should be able to do something like that and get away with it”; and descriptions of the defendant as “vicious,” worse than an animal, and unlikely to be rehabilitated. Booth, 482 U.S. at 508, 107 S.Ct. 2529.
We conclude that the Government did not violate these proscriptions in the course of eliciting witness testimony in the instant case. Initially, we note that Appellant mischaraeterizes the victim testimony as equating Appellant to a terrorist or traitor, or describing Appellant’s conduct as treasonous, mutinous, or assisting the enemy.
During the Government’s sentencing case, trial counsel posed questions concerning witnesses’ reaction upon learning that a fellow servieemember was the alleged perpetrator of the Camp Pennsylvania attack. Such questions were appropriate because they were designed to elicit testimony about the effect this unique bit of information had on the victims. Moreover, it was not improper for the Government witnesses, many of whom were also victims of the attack, to express human responses, including feeling “betrayed,” “disbelief,” “livid,” “angry,” “shocked,” and “pissed.”[17] This testimony placed Appellant’s crime in context by describing how his actions affected the victims of the attacks.
Also, COL Hodges’s testimony about “fraggings” during the Vietnam War was made in the context of describing why he, as commander of the battalion, was particularly psychologically shaken by Appellant’s particular attack, and we do not deem such testimony to be improper. Similarly, we conclude that COL Hodges’s observations about the “very worst days for the United States Army” were not inflammatory in intent or effect. Instead, they reflected COL Hodges’s embarrassment and dismay that Appellant’s attack occurred in the battalion he was commanding, and COL Hodges’s comments were directly responsive to trial counsels’ question about how Appellant’s attack had affected him.
We also do not consider improper trial counsel’s sentencing argument in which he characterized Appellant as “the enemy within the wire” and asked for the imposition of the death penalty in order to send a *394 message about the value of innocent life and the value of loyalty. Trial counsel “may strike hard blows,” but “he is not at liberty to strike foul ones.” Berger v. United States, 295 U.S. 78, 88, 55 S.Ct. 629, 79 L.Ed. 1314 (1935); see also United States v. Halpin, 71 M.J. 477, 479 (C.A.A.F.2013). He “may ‘argue the evidence of record, as well as all reasonable inferences fairly derived from such evidence.’” Halpin, 71 M.J. at 479 (quoting United States v. Baer, 53 M.J. 235, 237 (C.A.A.F.2000)). This includes arguments in capital cases concerning “the human cost” of an accused’s capital crime. Payne, 501 U.S. at 827, 111 S.Ct. 2597. Under the circumstances of this case, it was not a foul blow to characterize Appellant as the enemy within the wire given his act of tossing grenades and shooting officers within the confines of Camp Pennsylvania at the start of Operation Iraqi Freedom.
Trial counsels’ request to send a message about the value of life, loyalty, and the bond among the band of brothers was essentially a general deterrence argument. Trial counsel may make such general deterrence arguments when they are not the Government’s only argument and when the military judge properly instructs the members about conducting an individualized consideration of the sentence. See United States v. Lania, 9 M.J. 100, 104 (C.M.A.1980) (stating that “general deterrence is suitable for consideration in sentencing and for instructions”). Trial counsels’ argument was more than one of general deterrence because it focused on Appellant’s motivation, his acts, and their aftermath. Also, the military judge properly instructed the panel as to general deterrence. Therefore, there was nothing improper in asking the members to send a general deterrence message.
Finally, Appellant challenges trial counsel’s two references to “weighing life”:
• “What you must decide is what a life is worth; what two lives are worth; what a military career is worth; what the use of your legs are worth; what a little boy’s life without his father is worth.”
• “Weigh his life — that is what you’re doing. You’re weighing his life against what he did, what he caused, and what he set in motion forever.”
These comments were made in the specific context of trial counsel’s argument that the aggravating circumstances outweighed the mitigating circumstances. This is “entirely consistent with Payne’s recognition that victim-impact evidence is properly considered to ‘counteract’ the mitigating evidence in helping the [fact-finder] evaluate moral culpability.” United States v. Lawrence, 735 F.3d 385, 435 (6th Cir.2013). Also, we note that other federal courts have held that “to the extent that [Payne ] expressed disapproval of comparative worth arguments, it did so only with regard to victim-to-victim comparisons, not victim-to-defendant comparisons.” United States v. Fields, 483 F.3d 313, 340-41 (5th Cir.2007) (citing Humphries v. Ozmint, 397 F.3d 206, 224 n. 8 (4th Cir.2005)). Trial counsel in the instant case did not make victim-to-victim characterizations. We therefore find no error in his argument.[18]
Even if we were to assume that trial counsels’ arguments were improper, we conclude that Appellant has demonstrated no prejudice. In the plain error context, we determine whether the cumulative effect of an improper sentencing argument impacted “the accused’s substantial rights and the fairness and integrity of his trial.” Halpin, 71 M.J. at 480 (quoting United States v. Erickson, 65 M.J. 221, 224 (C.A.A.F.2007)). This inquiry examines “whether trial counsel’s comments, taken as a whole, were so damaging that we cannot be confident that the appellant was sentenced on the basis of the evidence alone.” Id. (quoting Erickson, 65 M.J. at 224) (original alterations and internal punctuation omitted). This case involved many aggravating circumstances, including Appellant’s murder of two military officers, his use of grenades, the extensive injuries to some officers, and the impact of the attack on the unit as it prepared for battle. Also, the fact that trial defense counsel did not see fit to object to the argument is “some measure” *395 that the argument had “minimal impact.” United States v. Gilley, 56 M.J. 113, 123 (C.A.A.F.2001) (quoting United States v. Carpenter, 51 M.J. 393, 397 (C.A.A.F.1999)). Accordingly, we do not conclude that trial counsel’s argument warrants reversal.
D. Sua Sponte Disqualification of Members
Appellant challenges the military judge’s failure to sua sponte dismiss fourteen of the fifteen panel members on implied and/or actual bias grounds. We note that “[i]t is clear that a military judge may excuse a member sua sponte” under R.C.M. 912(f)(4). United States v. Strand, 59 M.J. 455, 458 (C.A.A.F.2004). That rule permits a military judge to, “in the interest of justice, excuse a member against whom a challenge for cause would lie” even if neither party has raised such a challenge. See R.C.M. 912(f)(4) (2005 ed.). However, in United States v. McFadden the majority held that although “[a] military judge has the discretionary authority to sua sponte excuse [a] member, [he] has no duty to do so.” 74 M.J. 87, 90 (C.A.A.F.2015). Moreover, even if the military judge had such a duty, he did not abuse his discretion in failing to sua sponte remove any of the members for the reasons that follow.
First, we are mindful of the essential fact that, as noted above, trial defense counsel were using the ace of hearts strategy during this voir dire process, and we note that the military judge had been placed on notice that Appellant was “seeking to maximize the panel size.” Second, the military judge had afforded trial defense counsel great leeway in determining how they would conduct voir dire, thereby obviating the need for the military judge to take a more active role in the process. Third, the military judge could observe that trial defense counsel were not impassive in the voir dire process, as evidenced not only by their questioning of potential panel members but also by the fact that they sought and obtained the removal of a member on implied bias grounds, did not object to the Government’s challenge to three other members, and explained their opposition to the Government’s challenges to three additional panel members.
In regard to Appellant’s challenges to the service on the panel of specific members, we make the following observations. Appellant first states that the military judge should have sua sponte disqualified COL GQ and COL PM because of their friendly relationship with COL Hodges, a victim and witness in Appellant’s case. However, it is not an infrequent occurrence in the military for a panel member to know a witness in a court-martial, and without more, we have not found implied bias in such circumstances. Cf. United States v. Ai, 49 M.J. 1, 5 (C.A.A.F.1998) (rejecting member challenge on implied bias grounds where member held professional relationship with witness, candidly disclosed the relationship, and unequivocally denied influence).[19] We similarly decline to do so here.
Second, Appellant states that the military judge should have sua sponte dismissed LTO CF and LTC DL because another panel member, COL PM, had a supervisory relationship over them. Once again, it is not an infrequent occurrence in the military to have panel members who have a supervisory relationship with another panel member. And where, as here, all of the panel members state openly that they will not feel constrained in performing their court-martial duties, there is an insufficient basis for the military judge to sua sponte remove them from the panel. United States v. Castillo, 74 M.J. 39, 43 (C.A.A.F.2015) (“[A] senior-subordinate/rating relationship does not per se *396 require disqualification of a panel member.”) (quoting United States v. Wiesen, 56 M.J. 172, 175 (C.A.A.F.2001)).
Third, Appellant argues that the military-judge should have sua sponte dismissed LTC WT from the panel because of his relationships with his two older brothers. One brother was the commanding general of the 101st Airborne Division, the unit to which Appellant and some of the victims wei'e assigned. The other brother worked with a victim in this ease and served as the executive officer for the senior commanding general of the convening authority in this case. However, LTC WT stated he did not discuss the case with his brothers or feel any pressure to vote in any particular manner in this case. We therefore conclude that LTC WH”s fraternal relationships did not provide a basis for the military judge to sua sponte dismiss LTC WT. See Strand, 59 M.J. at 459 (finding military judge did not have a sua sponte duty to dismiss for implied bias a member who was the son of the commander). This is particularly true here because both Appellant and his trial defense counsel specifically stated that they did not want to excuse LTC WH1 for cause.
Fourth, Appellant generally challenges a number of members — SFC KD, MAJ DS, LTC TG, SFC JC, CSM MH, CSM RC, and MSG PC — on the basis that they had an inelastic predisposition to adjudge a particular sentence. We note, of course, that Appellant is “entitled to have his case heard by members who are not predisposed or committed to a particular punishment, or who do not possess an inelastic attitude toward the punitive outcome.” United States v. Martinez, 67 M.J. 59, 61 (C.A.A.F.2008) (citing United States v. James, 61 M.J. 132, 138 (C.A.A.F.2005)); see also R.C.M. 912(f)(1)(N) Discussion. However, the record reveals that each of these panel members agreed to follow the military judge’s instructions and to appropriately consider a full range of punishments in this case. Therefore, the voir dire of these individual members disclosed no basis for the military judge to sua sponte disqualify them.
Fifth, we have reviewed LTC TG’s views on Islam[20] and share some of Appellant’s concerns about his comments during voir dire. However, we ultimately conclude that the military judge should not have invoked his authority under R.C.M. 912(f) to dismiss LTC TG sua sponte because LTC TG also expressed positive views of Muslims, describing them as “very nice” and “very friendly people,” and more importantly, because LTC TG stated openly that he would not be influenced in the course of the trial by any of his preconceptions about Muslims generally. See United States v. Elfayoumi, 66 M.J. 354, 357 (C.A.A.F.2008) (noting that question of bias is not whether a member has particular views but whether- they can put these views aside to evaluate the ease on its merits).
Sixth, Appellant avers that the military judge should have sua sponte dismissed SFC JC from the panel because he stated that Appellant sounded guilty. We note that a member “must be excused when he or she ‘[h]as [ jformed or expressed a definite opinion as to the guilt or innocence of the accused as to any offense charged.’ ” United States v. Nash, 71 M.J. 83, 88 (C.A.A.F.2012) (quoting R.C.M. 912(f)(1)(M)). However, in the instant case SFC JC’s voir dire responses “dispel[led] the possibility” of bias because he stated that his initial opinion was not definite and that he understood Appellant was presumed innocent. See id. at 89; see also Irvin v. Dowd, 366 U.S. 717, 723, 81 S.Ct. 1639, 6 L.Ed.2d 751 (1961). Therefore, we conclude that the military judge did not abuse his discretion in failing to sua sponte dismiss SFC JC.
Seventh, Appellant contends that the military judge should have sua sponte excused CSM MH for ignoring the military judge’s order to avoid exposure to any pretrial publicity about Appellant’s case. We find this challenge meritless because trial defense counsel specifically opposed MH’s removal. *397 We also find that although CSM MH admitted to reading about the MP stabbing incident in the newspaper, he stated he could put the event out of his mind. Therefore, the military judge did not err in failing to sua sponte disqualify MH.
Eighth, Appellant challenges ten other panel members because of their knowledge of the March 30 stabbing incident. We note, however, that panel members are not automatically disqualified simply because they have learned facts about an accused from outside sources. Cf. Murphy v. Florida, 421 U.S. 794, 799, 95 S.Ct. 2031, 44 L.Ed.2d 589 (1975) (noting that defendant is not presumptively deprived of his due process rights if juror is exposed “to information about a state defendant’s prior convictions or to news accounts of the crime with which he is charged”). These ten challenged panel members, along with SGM MH, generally reported learning something along the lines of Appellant overpowering an MP, scuffling with an MP, or stabbing an MP. However, to the extent that the members were asked, they uniformly expressed their ability to lay aside their knowledge of these events in rendering a verdict in this case, which vitiates Appellant’s claim of actual bias. Cf. Murphy, 421 U.S. at 800-01, 95 S.Ct. 2031 (noting in finding no due process violation that no jurors “betrayed any belief in the relevance of [the defendant’s] past to the present case”); United States v. McVeigh, 153 F.3d 1166, 1184 (10th Cir.1998) (finding no actual bias despite some members learning of appellant’s confession from news reports where jurors indicated they could keep an open mind).
In terms of implied bias, we find none in this instance because trial defense counsel made no attempt to have the members excused based on their knowledge of the stabbing incident, trial defense counsel adequately explored their concerns during the voir dire process, and the members stated that they would judge the case on the merits rather than decide the ease based on this incident. Therefore, the military judge did not abuse his discretion by declining to sua sponte dismiss these panel members.
Ninth, and finally, Appellant challenges seven members because of their initial negative reactions to Appellant’s attack. Specifically, these members expressed “shock” (or a similar emotion) upon first learning about the events at Camp Pennsylvania. However, we note the long-standing principle that a member “is not disqualified just because he has been exposed to pretrial publicity or even has formulated an opinion as to the guilt or innocence of an accused on the basis of his exposure.” United States v. Calley, 22 C.M.A. 534, 537, 48 C.M.R. 19, 22 (1973); see also United States v. Barraza, 576 F.3d 798, 803 (8th Cir.2009) (“An initial impression about a case does not disqualify a [member] if the [judge] accepts the [member’s] assurances that he or she will set aside any preconceived beliefs and follow the court’s instructions.”); United States v. Iribe-Perez, 129 F.3d 1167, 1171 n. 4 (10th Cir.1997) (noting that although “noteworthy trials” will “pique the interest of the public” and will lead “many potential jurors [to] have formed initial impressions about the case,” a juror will not be disqualified unless he cannot set aside the initial impressions).
We find the members’ initial reactions to Appellant’s crimes to be neither unreasonable nor unexpected. Cf. Irvin, 366 U.S. at 722, 81 S.Ct. 1639 (noting that an “important case can be expected to arouse the interest of the public” so most jurors will have “formed some impression or opinion as to the merits of the case”). And importantly, the members’ voir dire responses indicated that their initial reactions would not impact their view of the case or affect their decisions in the course of the court-martial. Therefore, the members’ initial reactions did not provide the military judge with a sua • sponte basis to dismiss the challenged members. See Calley, 22 C.M.A. at 538, 48 C.M.R. at 23 (holding after careful consideration of voir dire that “none ... had formed unalterable opinions about [appellant’s] guilt from the publicity”).
E. Venue
Appellant asserts that his trial venue should have been moved because of pervasive pretrial publicity at Fort Bragg. *398 We review this challenge for an abuse of discretion. Loving, 41 M.J. at 282. Service-members are entitled to have their cases “adjudged by fair and impartial court-martial panels whose evaluation is based solely upon the evidence,” not pretrial publicity. United States v. Simpson, 58 M.J. 868, 372 (C.A.A.F.2003). Pretrial publicity by itself is not enough, however, for a change of venue. Curtis, 44 M.J. at 124. Instead, an accused is entitled to a change of venue if the “pretrial publicity creates ‘so great a prejudice against the accused that the accused cannot obtain a fair arid impartial trial.’ ” Loving, 41 M.J. at 254 (quoting R.C.M. 906(b)(11) Discussion).
Appellant’s change of venue argument is meritless. The' convening authority had already moved Appellant’s case to Fort Bragg from Fort Campbell, the headquarters for Appellant’s unit. Further, the military judge determined that the pretrial publicity was not inflammatory and had not saturated the community. In addition, as the above panel bias discussion demonstrates, the voir dire process uncovered no fixed opinions of Appellant’s case that rose to the level of actual prejudice. See Simpson, 58 M.J. at 372 (defining actual prejudice). Finally, Appellant’s position that the military community’s knowledge of his notorious crimes, standing alone, served as a basis for a change of venue would, if adopted, essentially have precluded the military from conducting Appellant’s court-martial at any military installation. The military judge therefore did not abuse his discretion in denying Appellant’s request to change venue.
F. Conflict of Interest
Appellant raises a number of alleged conflicts of interest in this case, but we find only one merits discussion — trial defense counsels’ working relationship with one of the victims, CPT Andras Marion, who served with the Army Judge Advocate General’s Corps. At an Article 39(a), UCMJ, hearing, MAJ Brookhart and CPT Coombs informed the military judge about-their “strictly professional” relationship with CPT Marion. Counsel explained that they had tried cases against CPT Marion, but did not have further contact with him. Appellant acknowledged that he was aware of the possible conflict and had the right to be represented by conflict-free counsel, but he expressly wanted MAJ Brookhart and CPT Coombs to continue representing him due to his familiarity with counsel and their familiarity with his ease.
An accused has the right to conflict-free legal representation. See United States v. Lee, 66 M.J. 387, 388 (C.A.A.F.2008); United States v. Murphy, 50 M.J. 4, 10 (C.A.A.F.1998). However, he .may waive this right so long as it is knowing and voluntary. United States v. Davis, 3 M.J. 430, 433 n. 16 (C.M.A.1977).
Although trial defense counsels’ relationship with a victim raises some obvious concerns, it does not establish reversible error because Appellant knowingly and voluntarily waived the issue. The military judge engaged in an open discussion with Appellant about the potential conflict. Following this discussion, Appellant informed the military judge that he wanted to waive any conflict or potential conflict. The post-trial affidavits alleging a conflict do not outweigh these considerations because the affidavits are conelu-sory in nature and are contradicted by trial defense counsel’s own statements and by the record.
G. Trial Defense Counsel Assignments
Appellant complains about unlawful command influence and prosecutorial misconduct stemming from the Government’s control of trial defense counsels’ assignments. Indeed, the record shows that the lead Government trial counsel arranged for MAJ Brookhart and CPT Coombs to be placed in positions that would not conflict with their roles as Appellant’s trial defense counsel. However, because Appellant never objected at trial to trial counsels’ role in these assignments, we review the arguments for plain error. See Halpin, 71 M.J. at 479-80.
Appellant cites no case law, and we are aware of none, finding prosecutorial misconduct under similar facts. Although this point is not dispositive because this could be an *399 issue of first impression, it does tend to show that trial counsels’ input into the trial defense counsels’ assignments does not plainly or obviously constitute prosecutorial misconduct. See United States v. Tarleton, 47 M.J. 170, 172 (C.A.A.F.1997) (noting that “the absence of controlling precedent favorable to appellant demonstrates that the error, if any, was not plain error”). But importantly, in reaching our decision on Appellant’s prosecu-torial misconduct argument and also his unlawful command influence argument, we rely heavily on the fact that Appellant has not demonstrated any unfairness in the proceedings based on defense counsels’ assignments. See Simpson, 58 M.J. at 373 (noting there is no unlawful command influence claim where there is no evidence of unfairness in the proceedings); United States v. Meek, 44 M.J. 1, 6 (C.A.A.F.1996) (holding that prosecutorial misconduct claim reviewed for prejudice); see also. Smith v. Phillips, 455 U.S. 209, 219, 102 S.Ct. 940, 71 L.Ed.2d 78 (1982) (noting that -“touchstone of due process analysis in cases of alleged prosecutorial misconduct is the fairness of the trial”). Indeed, the record of trial indicates that trial counsels’ actions were intended to assist Appellant by ensuring that his counsel remained available to him. We therefore see no basis for concluding there was prosecutorial misconduct and/or unlawful command influence in this case.
H. Trial Defense Counsels’ Qualifications
Appellant and amicus raise three distinct arguments about trial defense counsels’ qualifications, but as demonstrated below, none of them provides a basis for relief. First, Appellant contends that trial defense counsel did not have the training or experience necessary to effectively defend him in this case, and challenges the CCA’s conclusions that counsel were “well-qualified.” However, after reviewing trial defense counsels’ extensive legal experience as summarized at the beginning of this opinion, we reject Appellant’s argument outright and agree with the CCA’s conclusion that counsel were “well-qualified.”
Second, in its brief, amicus curiae advocates that we adopt and apply to the instant case the provisions of Guideline 5.1 of the American Bar Association (ABA) Guidelines for the Appointment and Performance of Counsel in Death Penalty Cases. This guideline seeks to establish minimum qualifications for counsel in capital eases. In addressing this issue, we take particular note of the Supreme Court’s memorable observation in Ring v. Arizona: “[D]eath is different.” 536 U.S. 584, 606, 122 S.Ct. 2428, 153 L.Ed.2d 556 (2002). Congress has recognized as much in civilian federal cases by requiring the services of at least one counsel “learned in the law applicable to capital cases.” 18 U.S.C. § 3005 (2012). Congress has even extended this requirement of “learned counsel” to alleged terrorists being prosecuted in military commissions. See 10 U.S.C. § 949a(b)(2)(C)(ii) (2012). We further note that even in the absence of congressional action, the judge advocates general could take unilateral steps to improve the process by which trial litigators are selected in capital cases, and to enhance their training and qualifications. Indeed, LTC Hansen, who we pointedly note was summarily dismissed by Appellant, serves as an example of someone who was particularly well qualified to litigate a capital ease. However, as an Article I court, we also note that — absent constitutional implications in a particular ease or congressional authorization — it is beyond our authority to impose the learned counsel qualification advocated by amicus. Indeed, in the past we have similarly considered and rejected claims that learned counsel must participate in military capital cases. See, e.g., Gray, 51 M.J. at 54; Curtis, 44 M.J. at 127; Loving, 41 M.J. at 300. Nonetheless, “we remain vigilant as to the quality of representation provided servicemembers in capital cases in the military justice system.” Gray, 51 M.J. at 54.
Finally, Appellant and amicus argue that we should adopt the ABA Guidelines in analyzing capital defense counsels’ performance. However, we instead adhere to the Supreme Court’s guidance that “[n]o particular set of detailed rules for counsel’s conduct can satisfactorily take account of the variety of circumstances faced by defense counsel or the range of legitimate decisions regarding how *400 best to represent a criminal defendant.” Strickland, 466 U.S. at 688-89, 104 S.Ct. 2052. We therefore do not adopt the ABA Guidelines as the ultimate standard for capital defense representation in the military. See Pinholster, 131 S.Ct. at 1407, 131 S.Ct. 1388 (“It is ‘[rjare’ that constitutionally competent representation will require ‘any one technique or approach.’”) (quoting Richter, 562 U.S. at 89, 131 S.Ct. 770). Instead, we examine whether “counsel [made] objectively reasonable choices” based on all the circumstances of a case. Van Hook, 558 U.S. at 9, 130 S.Ct. 13 (quoting Roe v. Flores-Ortega, 528 U.S. 470, 479, 120 S.Ct. 1029, 145 L.Ed.2d 985 (2000)).
I.Mitigation Evidence
Appellant contends that the panel’s consideration of mitigation evidence was unconstitutionally limited by the prohibition against guilty pleas in capital cases, which is contained in Article 45(b), UCMJ. This challenge is meritless based on our prior case law. Gray, 51 M.J. at 49; Loving, 41 M.J. at 292; United States v. Matthews, 16 M.J. 354, 362-63 (C.M.A.1983). It is also meritless under the facts of this case. Appellant refused to allow his counsel to submit any offers to plead guilty, so this potential mitigation evidence would never have been available for him to present at trial.
J.Exclusion of Occupational Branches
Appellant is correct that the exclusion of nine occupational branches from court-martial service in this case pursuant to Army Regulation (AR) 27-10 would have conflicted with the statutorily defined criteria in Article 25, UCMJ, 10 U.S.C. § 825 (2012). See United States v. Bartlett, 66 M.J. 426, 429 (C.A.A.F.2008). We conclude, however, that here there was no impermissible selection of panel members.
It is true that the initial convening authority was advised that he had to select the panel in accordance with AR 27-10. However, when the succeeding convening authority made his selections he was informed by the acting staff judge advocate: (1) “[Y]ou must detail those members who, in your opinion, are best qualified for the duty by virtue of their age, education, ... and judicial temperament”; and (2) “You may ... choose anyone in your general court-martial jurisdiction for service as a court member provided you believe they meet the Article 25 criteria listed above.” We recognize that the succeeding convening authority adopted his predecessor’s panel pool, but the succeeding convening authority did not act pursuant to the improper AR 27-10 instruction, but instead acted based on proper legal advisement in accordance with Article 25, UCMJ, criteria.
Also, even if the panel was impermissibly selected pursuant to AR 27-10, we conclude that the Government has met its burden of showing any error was harmless. As the Government demonstrates, the six circumstances which this Court identified and relied upon in deciding Bartlett, 66 M.J. at 431, as showing harmless error are also present here: (1) there is no evidence that the Secretary of the Army acted with an improper motivation in promulgating AR 27-10; (2) the convening authority followed a facially valid regulation without an improper motive; (3) the convening authority had authority to convene a general-court martial; (4) Appellant was sentenced by members who were selected by the convening authority; (5) Appellant was sentenced by members who met the Article 25, UCMJ, criteria; and (6) the military judge noted that the panel had female and African American representation. We therefore find no reversible error in the convening authority’s selection of the panel’s venire.
K.CCA Ruling on Appellate Experts
Appellant claims that the CCA erred in denying his request for appellate assistance by mental health experts.' The CCA concluded that Appellant had failed to sufficiently show that the expert assistance was necessary. We review this decision for an abuse of discretion. Gray, 51 M.J. at 20. An abuse of discretion arises if the CCA’s factual findings are clearly erroneous or if its decision is based on a misapplication of the law. See United States v. Taylor, 47 M.J. 322, 325 (C.A.A.F.1997). Neither factor applies in this instance, and we find no abuse of discretion in the CCA’s denial of expert assistance.
*401 L. Military Judge’s Instructions
Appellant challenges two instructions by the military judge: (1) the sentencing instruction relating to weighing mitigating and aggravating factors; and (2) the instruction on reconsidering the sentence. Ordinarily, we review the adequacy of a military judge’s instructions de novo. United States v. MacDonald, 73 M.J. 426, 434 (C.A.A.F.2014). However, if an appellant fails to object to the instruction at trial, we review for plain error. United States v. Thomas, 46 M.J. 311, 314 (C.A.A.F.1997); R.C.M. 1005(f).
1. Sentencing
The military judge instructed the panel that to impose a death sentence, it had to unanimously determine, in relevant part, (1) “beyond a reasonable doubt, that the aggravating factor existed,” and (2) that “the extenuating and mitigating circumstances are substantially outweighed by the aggravating circumstances.” Appellant now argues that the military judge should have instructed the members that they had to find that the aggravating circumstances outweighed the mitigating circumstances beyond a reasonable doubt. Appellant bases this argument on his reading of the Supreme Court’s decisions in Apprendi v. New Jersey, 530 U.S. 466, 120 S.Ct. 2348, 147 L.Ed.2d 435 (2000), and Ring v. Arizona, 536 U.S. 584, 122 S.Ct. 2428, 153 L.Ed.2d 556 (2002), which stand for the proposition that a jury must find beyond a reasonable doubt aggravating factors that are necessary to impose the death penalty. See Ring, 536 U.S. at 609, 122 S.Ct. 2428; Apprendi 530 U.S. at 490, 120 S.Ct. 2348. However, contrary to Appellant’s assertion, these cases do not require any particular standard of proof with regard to weighing the aggravating and mitigating circumstances. United States v. Gabrion, 719 F.3d 511, 533 (6th Cir.2013) (en bane) (joining six other federal circuits in concluding that decision weighing aggravating and mitigating did not have to be proven beyond a reasonable doubt); Lockett v. Trammel, 711 F.3d 1218, 1253 (10th Cir.2013). Indeed, the Supreme Court itself has indicated that the beyond a reasonable doubt standard is unnecessary in weighing aggravating and mitigating factors. See Kansas v. Marsh, 548 U.S. 163, 173, 126 S.Ct. 2516, 165 L.Ed.2d 429 (2006) (noting that state could place burden on defendant to prove mitigating circumstances outweighed aggravating circumstances); id. at 174, 126 S.Ct. 2516 (noting that states have “a range of discretion in imposing the death penalty, including the manner in which aggravating and mitigating circumstances are to be weighed”). We therefore find no error in the military judge’s sentencing instruction.
2. Reconsideration
After the members requested reconsideration of their sentence, the military judge, without objection and with Appellant’s consent, provided the members with the stan- ' dard Benchbook reconsideration instruction 2-7-19. Dep’t of the Army, Pam. 27-9, Legal Service, Military Judges Benchbook ch. 2 § VII, para. 2-7-19 (2010). Appellant now claims the military judge should have instructed the members either (1) not to impose death if they had initially voted for life or, alternatively, (2) to follow the R.C.M. 1004 deliberative process during reconsideration.[21] The parties agree that Appellant forfeited this issue by failing to raise it at trial, so we review this claim for plain error. See Thomas, 46 M.J. at 314.
We find no plain or obvious error in the military judge’s reconsideration instruction. First, Appellant has cited no case law to support his position that “R.C.M. 1009 does not authorize a panel to reconsider its sentencing determination with a view toward increasing a sentence to death.” There also is no factual support for Appellant’s position *402 because the record does not indicate whether the panel requested reconsideration in order to increase Appellant’s sentence to death or to decrease his sentence. Second, we are not persuaded that a plain reading of the text of this rule mandates this conclusion. For instance, R.C.M. 1009(e)(3)(A), which identifies the number of votes needed to increase a sentence on reconsideration, does not provide an exception in death penalty cases. The reconsideration provision for decreasing a sentence, on the other hand, does contain a specific provision for death cases. See R.C.M. 1009(e)(3)(B)(i). Because R.C.M. 1009 does not explicitly prohibit the panel from reconsidering a sentence in a capital case with a view to increasing the sentence to death, we conclude that the military judge’s reconsideration instruction was not plainly erroneous. Without case law or the text of R.C.M. 1009 clearly supporting Appellant’s claim, we find no plain or obvious error. See United States v. Nieto, 66 M.J. 146, 150 (C.A.A.F.2008) (finding no clear or obvious error where “at the time of trial, the case law from this Court did not preclude trial counsel’s questions, generally applicable federal criminal law did not provide guidance on point, and only a handful of state cases addressed this matter”).-
Third, Appellant has not demonstrated that it was plain error for the military judge to authorize a revote without repeating the required instructions under R.C.M. 1004(b)(6). In regard to this argument, it is sufficient to note that the military judge read, with Appellant’s express agreement, Benchbook instruction 2-7-19, which specifically instructed the members to “adhere to all my original instructions for proposing and determining an appropriate sentence.” We therefore find no reversible error stemming from the military judge’s reconsideration instruction.
M. Motion to Suppress
Appellant argues that the military judge’s decision to admit Appellant’s confession under the public safety exception was error because the confession was obtained in violation of his Article 31(b), UCMJ, 10 U.S.C. § 831(b) (2012), and Miranda[22] rights.[23] The following facts serve as the basis for this challenge.
Shortly after Appellant’s attack on the brigade officers at Camp Pennsylvania, COL Hodges informed MAJ Warren, who was coordinating security: “This may be one of our own. 2d Battalion is missing an engineer soldier. His name is Sergeant Akbar_ There’s some ammo missing.” Soon after this briefing, MAJ Warren found Appellant, grabbed him, and forced him to lie face down on the ground. Once Appellant was on the ground, MAJ Warren pointed his firearm at Appellant while holding him down with his left hand. He then told Appellant not to move. After reholstering his firearm as another soldier stood guard, MAJ Warren kneeled down, looked directly at Appellant’s face, and asked Appellant, “Did you do this? Did you bomb the tent?” Appellant responded, ‘Yes.” Prior to questioning Appellant, MAJ Warren did not give Appellant any Article 31(b), UCMJ, warnings.
We conclude that the military judge did not abuse his discretion in admitting Appellant’s confession. The Supreme Court has recognized a public safety exception to Mi *403 randa warnings. New York v. Quarles, 467 U.S. 649, 655-66, 104 S.Ct. 2626, 81 L.Ed.2d 550 (1984). We have extended this exception to Article 81, UCMJ, rights advisements “when life is endangered.” United States v. Jones, 26 M.J. 353, 357 (C.M.A.1988); see also United States v. Morris, 28 M.J. 8, 14 (C.M.A.1989). In an instance such as this one, an unwarned statement is inadmissible under Article 31(b), UCMJ, unless (1) the statement falls within the public safety exception and (2) the statement was voluntary. Jones, 26 M.J. at 357; cf. Quarles, 467 U.S. at 654, 104 S.Ct. 2626 (noting that in absence of evidence of compelled confession, Court was only examining whether public safety justified failure to give Miranda warning). Appellant challenges only the public safety exception aspect of this test.
We conclude that the public safety exception did apply to Appellant’s statement. MAJ Warren conducted his questioning of Appellant in a combat staging area shortly after Appellant’s deadly attack on the brigade’s officer corps on the eve of battle. At the time MAJ Warren questioned Appellant, the perpetrator of the attack remained at large and his identity was unclear. MAJ Warren’s questioning ensured that no further life would be endangered by seeking to definitively ascertain the identity of the attacker. Once MAJ Warren obtained the admission, he ceased all questioning, further indicating that the questions were elicited solely to secure the safety of the Camp. See Quarles, 467 U.S. at 659, 104 S.Ct. 2626 (observing applicability of public safety exception where law enforcement “asked only the question necessary to locate the missing gun before advising respondent of his rights”). Under these circumstances, the military judge did not err in concluding the public safety exception applied.[24]
Even assuming that the admission of Appellant’s confession was error, it was harmless beyond a reasonable doubt. The admission of a confession is prejudicial if, after reviewing the entire record of an individual case, “ ‘there is a reasonable possibility that the evidence complained of might have contributed to the conviction.’ ” United States v. Mott, 72 M.J. 319, 332 (C.A.A.F.2013) (quoting United States v. Moran, 65 M.J. 178, 187 (C.A.A.F.2007)). Appellant’s confession presents no such reasonable possibility because Appellant did not contest his identity as the attacker at the court-martial. Also, there was overwhelming evidence that Appellant was responsible for the attack, including Appellant’s fingerprints on the generator switch, the rounds from Appellant’s weapon matched the rounds used in the attack, and Appellant’s possession of grenades when apprehended. See United States v. Powell, 49 M.J. 460, 464 (C.A.A.F.1998) (explaining that Supreme Court in Arizona v. Fulminante, 499 U.S. 279, 111 S.Ct. 1246, 113 L.Ed.2d 302 (1991), found admission of an involuntary confession harmless where there was overwhelming evidence of guilt), This overwhelming evidence directly linked Appellant to the attack, and we find that any *404 error in admitting Appellant’s admission was harmless beyond a reasonable doubt.
N. Military Capital Case Procedures
Appellant challenges the constitutionality of three aspects of the military capital procedures: (1) the congressional delegation of capital sentencing procedures to the President; (2) R.C.M. 1004’s authorization for the convening authority to add aggravating elements at referral; and (3) the lack of a system to ensure consistent application of the death penalty in the military. None of these challenges warrants relief.
First, the Supreme Court has already upheld the congressional delegation of the R.C.M. 1004 capital sentencing procedures to the President in Loving v. United States, 517 U.S. 748, 116 S.Ct. 1737, 135 L.Ed.2d 36 (1996). Appellant claims that the Supreme Court’s decision in Ring v. Arizona, 536 U.S. at 608-09, 122 S.Ct. 2428, “overruled Loving sub silentio.” However, the Supreme Court has instructed: “If a precedent of this Court has direct' application in a ease, yet appears to rest on reasons rejected in some other line of decisions, the [lower court] should follow the case which directly controls, leaving to [the Supreme Court] the prerogative of overruling its own decisions.” Rodriguez de Quijas v. Shearson/Am. Express, Inc., 490 U.S. 477, 484, 109 S.Ct. 1917, 104 L.Ed.2d 526 (1989). Consistent with this mandate, we will continue to adhere to the holding in Loving unless the Supreme Court decides at some point in the future that there is a basis to overrule that precedent. As a result, we reject Appellant’s constitutional challenge to R.C.M. 1004 on the basis that it constitutes an improper delegation of power.
Second, Appellant argues that R.C.M. 1004 violates his due process rights by allowing the convening authority to add and amend aggravating factors at the time of referral. The relevant R.C.M. 1004 provision states:
Before arraignment, trial counsel shall give the defense written notice of which aggravating factors under subsection (c) of this rule the prosecution intends to prove. Failure to provide timely notice under this subsection of any aggravating factors under subsection (e) of this rule shall not bar later notice and proof of such additional aggravating factors unless the accused demonstrates specific prejudice from such failure and that a continuance or a recess is not an adequate remedy.
R.C.M. 1004(b)(1) (2005 ed.). In this case, the charge sheet omitted tl>e R.C.M. 1004(c) aggravating factors, but it contained special instructions that the court-martial “be tried as a capital case.” In accordance with R.C.M. 1004(b)(1), the Government notified Appellant prior to arraignment of the two aggravating factors it intended to prove.[25]
An aggravating factor that renders an accused eligible for death is “the functional equivalent of an element of a greater offense.” Ring, 536 U.S. at 609, 122 S.Ct. 2428 (quoting Apprendi, 530 U.S. at 494 n. 19, 120 S.Ct. 2348). The Supreme Court has determined that the Fifth Amendment’s due process clause and the Sixth Amendment’s notice and jury trial guarantees require any fact “that increases the maximum penalty for a crime [to be] charged in an indictment, submitted to a jury, and proven beyond a reasonable doubt.” Jones v. United States, 526 U.S. 227, 243 n. 6, 119 S.Ct. 1215, 143 L.Ed.2d 311 (1999). For purposes of this appeal, we assume that the Government must allege in the charge sheet the aggravating factor as a functional equivalent of an element, and we therefore further assume that the Government erred in failing to allege the aggravating factor on the charge sheet in the instant ease.
Federal circuit courts have labeled this type of charging error as an “Apprendi error.” See, e.g., United States v. Robinson, 367 F.3d 278, 285 (5th Cir.2004) (defining “Apprendi error” as “the failure of an indictment specifically to charge aggravating factors regarded as elements because they increase the maximum available punishment”). Those circuit courts that have examined the *405 issue have determined such a charging error is subject to harmless error review. See, e.g., id. at 286 (concluding that Apprendi error is not a structural error and subject to harmless error review); see also 5 Wayne R. LaFave et al., Criminal Procedure § 19.8, at 266 (3d ed. 2007) (Circuit courts have “almost uniformly held that the failure of the indictment to include the Apprendi-element, like the failure to submit that element to the jury, [is] subject to harmless error review.”). Our case law also indicates that this type of Ap-prendi error would be subject to harmless error review. See United States v. Humphries, 71 M.J. 209, 215 (C.A.A.F.2012) (noting that each case in which an element was not alleged “must be reviewed for harmless error to determine whether the constitutional error was harmless beyond a reasonable doubt”). Because Appellant preserved the charging issue at trial, the Government bears the burden of establishing the error was harmless beyond a reasonable doubt. See id. at 213 n. 5; United States v. Savala, 70 M.J. 70, 77 (C.A.A.F.2011). A specification’s failure to allege an element is not harmless if this “error frustrated an accused’s right to notice and opportunity to zealously defend himself.” United States v. Gaskins, 72 M.J. 225, 233 (C.A.A.F.2013).
The Government has established that any error in failing to allege the aggravating factor in the charge sheet was harmless. First, the fundamental essence of the aggravating factor ultimately pursued by the Government—multiple murder (R.C.M. 1004(c)(7)(J))—already appeared on the charge sheet as Appellant was charged in separate specifications with murdering CPT Seifert and MAJ Stone, and the investigating officer recommended that both specifications go forward. Cf. Robinson, 367 F.3d at 288-89 (concluding that Apprendi error was harmless in part where there was sufficient evidence that grand jury would have indicted had it known the proper elements). Second, the Government has demonstrated that Appellant’s trial defense counsel could not articulate how he would have altered his strategy at the Article 32, UCMJ, 10 U.S.C. § 832 (2012), hearing had the charge sheet specifically alleged the aggravating factor. Finally, Appellant received actual notice of the aggravating factors prior to his arraignment pursuant to R.C.M. 1004(c)(1) allowing him ample opportunity to prepare for the aggravating factor. See Robinson, 367 F.3d at 287 (finding Apprendi error harmless in part where defendant had sufficient notice and opportunity to defend against aggravating factor). We therefore conclude that any error in failing to allege the aggravating factor in the charge sheet was harmless. Because we resolve Appellant’s due process argument on harmless error grounds, we do not need to reach the issue of whether R.C.M. 1004 is unconstitutional in the instant case. However, we note that Appellant has raised a viable question as to whether adherence to the provisions of R.C.M. 1004(b)(1) may violate Fifth Amendment due process rights. See Ring, 536 U.S. at 609, 122 S.Ct. 2428; Apprendi, 530 U.S. at 490, 120 S.Ct. 2348; Jones, 526 U.S. at 243 n. 6, 119 S.Ct. 1215; United States v. Fosler, 70 M.J. 225, 229-30, 232 (C.A.A.F.2011); cf. United States v. Lawrence, 735 F.3d 385, 420 (6th Cir.2013) (“After Ring, several courts have held that an indictment charging a death-eligible offense under the [Federal Death Penalty Act] must charge the statutory aggravating factors.”).
Third, citing the provisions in the United States Attorneys’ Manual that set forth policies and procedures in, federal civilian capital eases, Appellant claims the military’s failure to create similar procedures violates his Article 36, UCMJ, rights and his Fifth Amendment equal protection rights. Appellant’s reliance on Article 36, UCMJ, is unpersuasive because this article does not require the President to prescribe' similar policies for military death penalty eases. See Article 36(a), UCMJ, 10 U.S.C. 836(a) (2012) (noting that pretrial procedures “may be prescribed by the President, which shall, so far as he considers practicable, apply the principles of law and the rules of evidence generally recognized in the trial of criminal cases in the United States district courts”).
Appellant’s equal protection argument is equally unpersuasive. Appellant as- *406 serfs that servicemembers who are death-eligible are treated differently than their similarly situated civilian counterparts because convening authorities do not have to comply with death penalty protocols. “An ‘equal protection violation’ is discrimination that is so unjustifiable as to violate due process.” United States v. Rodriguez-Amy, 19 M.J. 177, 178 (C.M.A.1985). However, “equal protection is not denied when there is a reasonable basis for a difference in treats ment.” United States v. McGraner, 13 M.J. 408, 418 (C.M.A.1982). We do not find any unjustifiable discrimination in the instant ease because Appellant, as an accused ser-vicemember, was not similarly situated to a civilian defendant. See Parker v. Levy, 417 U.S. 733, 743, 94 S.Ct. 2547, 41 L.Ed.2d 439 (1974) (“[T]he military is, by necessity, a specialized society separate from civilian society.”). We also note that “[t]he policy of the Justice Department is but an internal policy, without the force of law and subject to change or suspension at any time.” Therefore, it does not serve as the basis for an equal protection violation. See United States v. Jones, 527 F.2d 817, 822 (D.C.Cir.1975); cf. United States v. Lopez-Matias, 522 F.3d 150, 156-57 (1st Cir.2008) (concluding United States Attorneys’ Manual on death penalty protocols did not confer substantive rights).[26] Accordingly, we conclude there was no equal protection violation.
O. Constitutionality of Death Sentence
Appellant contends that his death sentence violates (1) his Fifth Amendment rights because he has been denied due process and (2) his Eighth Amendment rights because his mental illness renders the punishment disproportionate to his culpability. We conclude that the claim of a Fifth Amendment due process violation is too vague to merit relief.[27]
Similarly, we are unpersuaded by Appellant’s Eighth Amendment claim. First, courts have uniformly determined that there is no constitutional impediment to imposing a capital sentence where a criminal defendant suffers from a mental illness.[28] See, e.g., Mays v. Stephens, 757 F.3d 211, 219 (5th Cir.2014) (noting that no Supreme Court case has “created a rale of constitutional law making the execution of mentally ill persons unconstitutional”); Franklin v. Bradshaw, 695 F.3d 439, 455 (6th Cir.2012) (noting “no authorities have extended [Supreme Court precedent] to prohibit the execution of those with mental illnesses”); Carroll v. Secretary, DOC, 574 F.3d 1354, 1369 (11th Cir.2009); Baird v. Davis, 388 F.3d 1110, 1114 (7th Cir.2004) (noting Supreme Court has not ruled on executions of those “who kill under an irresistible impulse”).
Second, Appellant’s specific mental illness did not make his death sentence highly disproportionate to his culpability. The Eighth Amendment prohibits punishments, including the death penalty, that are greatly disproportionate to the culpability of the accused, and thus “individualized consideration” is constitutionally required in imposing the death sentence. Enmund v. Florida, 458 U.S. 782, 798, 102 S.Ct. 3368, 73 L.Ed.2d *407 1140 (1982) (quoting Lockett v. Ohio, 438 U.S. 586, 605, 98 S.Ct. 2954, 57 L.Ed.2d 973 (1978)). The record demonstrates that individualized consideration did occur in the instant case. We first note that most of the mental health experts who examined Appellant concluded that although he suffered from some form of mental illness, he was mentally responsible at the time- he committed the offenses. Further, the panel members not only determined that Appellant had the requisite mental ability to form the premeditated intent to kill when he committed the offenses, they also determined that he deserved the punishment of death for those offenses. Accordingly, this record does not support the conclusion that Appellant’s mental impairments rendered his death sentence highly disproportionate to his culpability.
Third, to the extent Appellant claims that his mental illness presently rises to the level of insanity, once again the record does not support such a conclusion. We recognize that an accused’s “earlier competency to be held responsible for committing a crime and to be tried for it” does not foreclose a later determination that he or she is presently insane and cannot be executed. Panetti v. Quarterman, 551 U.S. 930, 934, 127 S.Ct. 2842, 168 L.Ed.2d 662 (2007). However, pri- or to and during the court-martial proceedings, mental health experts determined that Appellant was mentally responsible at the time of the offense and mentally competent to stand trial. There is no basis in the record for us to conclude that Appellant is presently insane.[29] Therefore, we reject Appellant’s Eighth Amendment challenge premised on a claim of mental illness. See Ford v. Wainwright, 477 U.S. 399, 410, 106 S.Ct. 2595, 91 L.Ed.2d 335 (1986).
P.Crime Scene Photographs
Appellant contends that the admission of the Government’s crime scene photographs violated his Fifth and Eighth Amendment right to due process because they were unduly prejudicial. We reject this challenge. We conclude that “it cannot be seriously argued that [the autopsy and surgical] photographs were admitted only to inflame or shock this court-martial.” Gray, 51 M.J. at 35.
Q.Voir Dire
Appellant asserts that the Government used voir dire to impermissibly advance the Government’s theory. The Discussion to Rule 912 states that voir dire should not be used “to argue the case.” R.C.M. 912(d) Discussion (2005 ed.)., However, Appellant does not cite any instances in the record where this occurred, and our review of the record does not reveal (1) any questions in which the Government impermissibly advanced its theory or (2) any objections by Appellant on this basis. This issue therefore does not provide any basis for reversal.
R.Government Peremptory Challenge
Appellant challenges the constitutionality of the Government’s use of peremptory challenges to remove a member whose moral bias against the death penalty does not justify a challenge for cause. As Appellant recognizes, we have previously rejected this argument. See Loving, 41 M.J. at 294-95; see also Gray, 51 M.J. at 33. He provides no compelling reason for us to reconsider our prior precedent, and we decline to do so.
S.Panel Reconsideration
Appellant claims that the panel’s reconsideration of its sentence violated the Fifth Amendment double jeopardy clause. The Supreme Court has held that, under the double jeopardy clause, a defendant cannot be sentenced to death at a retrial if he was sentenced to life imprisonment following a trial-like capital sentencing proceeding at his first trial. Caspari v. Bohlen, 510 U.S. 383, 386, 114 S.Ct. 948, 127 L.Ed.2d 236 (1994) (citing Bullington v. Missouri, 451 U.S. 430, 446, 101 S.Ct. 1852, 68 L.Ed.2d 270 (1981)). However, the circumstances of the instant ease are quite different from those in the eases cited above because here the same panel reconsidered its own sentence during its one and only deliberation session. There *408 fore, this Supreme Court precedent is readily distinguishable.[30] Moreover, we are unaware of any other cases that have applied double jeopardy principles to reconsideration of a death sentence at the same trial and during the course of the same deliberations, and Appellant has cited no such authority. For these reasons, we conclude that there is no double jeopardy violation stemming from the panel’s reconsideration of its sentence in the course of its deliberations, and its ultimate imposition of a death sentence in this ease.
T. CCA Proportionality Review
Appellant seeks a remand because the CCA failed to engage in a proportionality review. Although not constitutionally required, we have interpreted Article 66(c), UCMJ, 10 U.S.C. § 866(c) (2012), as requiring the courts of criminal appeals to perform proportionality reviews of death sentences as part of the sentence appropriateness determination. United States v. Curtis, 33 M.J. 101, 109 (C.M.A.1991). Our task is to assure that the lower court’s review was “properly performed.” Id. However, we do not require a lower court to “always articulate its reasoning for its decisions.” United States v. Wean, 37 M.J. 286, 287 (C.M.A.1993) (citing United States v. Clifton, 35 M.J. 79 (C.M.A.1992)); see also United States v. Winckelmann, 73 M.J. 11, 16 (C.A.A.F.2013) (stating that CCA was not “obligated” to detail its analysis); United States v. Matias, 25 M.J. 356, 361 (C.M.A.1987) (noting that no provision in the UCMJ or the R.C.M. requires the lower court to address all assignments of error in a written opinion).
Although the CCA did not explicitly include any discussion of a proportionality review in its opinion, we conclude that Appellant received a proper legal review under Article 66(c), UCMJ. We first note that Appellant raised an Article 66(c), UCMJ, proportionality challenge below, so the CCA was fully aware of the need to resolve this issue. We next note that, absent evidence to the contrary, we presume that the judges on the courts of criminal appeals know and properly apply the law. United States v. Schweitzer, 68 M.J. 133, 139 (C.A.A.F.2009). Given this presumption and these facts, we find that the CCA implicitly performed its Article 66(c), UCMJ, proportionality review when it determined, both initially and on reconsideration, that Appellant’s approved sentence was “correct in law and fact.” Cf. United States v. Reed, 54 M.J. 37, 42-43 (C.A.A.F.2000) (finding “nothing in the opinion that would lead one to conclude that the lower court did not give ... appellant’s assignment ] of error careful consideration”). Although we emphasize that an explicit discussion by the CCA of its proportionality review would have been far preferable,[31] we do not find a sufficient basis to remand this ease for the CCA to explicitly articulate its reasoning in the course of performing its proportionality review.[32]
U. Joint Affidavits
The courts of criminal appeals are authorized to compel trial defense counsel to submit affidavits. United States v. Lewis, 42 M.J. 1, *409 5 (C.A.A.F.1995). Here, the CCA authorized trial defense counsel, MAJ Brookhart and CPT Coombs, to submit joint affidavits. Appellant challenges this decision because the joint affidavits prevented him from obtaining the independent recollections of each counsel.
The courts of criminal appeals have “discretion ... to determine how additional evidence, when required, will be obtained.” Lewis, 42 M.J. at 6. They may determine that evidence is required “by affidavit, testimony, stipulation, or a factfinding hearing.” Boone, 49 M.J. at 193. “We are reluctant to mandate procedures for the” courts of criminal appeals, but we will do so when appropriate. Lewis, 42 M.J. at 6.
We conclude that the CCA did not abuse its discretion in permitting trial defense counsel to submit joint affidavits. Appellant has not cited any authorities directly prohibiting the use of joint affidavits, and we have found none.[33] Absent any authority prohibiting the use of joint affidavits, we conclude that the CCA did not abuse its discretion in allowing trial defense counsel to submit one.
Although we conclude that there was no error, we do have reservations about the submission of joint affidavits by trial defense counsel when an appellant alleges ineffective assistance of counsel. Almost by necessity, joint affidavits harmonize the memories and views of each counsel, and they often use the pronoun “we” when explaining the actions or reasoning that only one counsel may have engaged in. Therefore, although “[w]e evaluate the combined efforts of the defense as a team rather than evaluating the individual shortcomings of any single counsel,” United States v. Garcia, 59 M.J. 447, 450 (C.A.A.F.2004), we conclude that the better practice in future cases is for the courts of criminal appeals to require counsel to submit individual affidavits. Nonetheless, we conclude there was no error in the instant case.
III. Decision
The decision of the United States Army Court of Criminal Appeals is affirmed.
Appendix
Issues Presented
A.I
SGT HASAN K. AKBAR WAS DENIED HIS RIGHT TO THE EFFECTIVE ASSISTANCE OF COUNSEL, AS GUARANTEED BY THE SIXTH AMENDMENT TO THE UNITED STATES CONSTITUTION, AT EVERY CRITICAL STAGE OF HIS COURT-MARTIAL.
A. II
THIS’ COURT SHOULD' ORDER A POST-TRIAL EVIDENTIARY HEARING TO RESOLVE DISPUTED FACTUAL ISSUES RELEVANT TO SGT AKBAR’S NUMEROUS COLLATERAL CLAIMS UNLESS THIS COURT FINDS IN HIS FAVOR ON ANOTHER DISPOSITIVE GROUND.
AHI
WHETHER THE PROSECUTION’S VICTIM-IMPACT PRESENTATION AND ARGUMENT, AND COUNSEL’S FAILURE TO OBJECT, VIOLATED SGT AKBAR’S FIFTH, SIXTH, AND EIGHTH AMENDMENT RIGHTS.
AIV
THE MILITARY JUDGE, BY FAILING TO SUA SPONTE DISMISS FOURTEEN OF THE FIFTEEN PANEL MEMBERS FOR CAUSE BASED ON ACTUAL AND IMPLIED BIAS MANIFESTED BY RELATIONSHIPS OF THE MEMBERS, A PREDISPOSITION TO ADJUDGE DEATH, AN INELASTIC OPINION AGAINST CONSIDERING MITIGATING *410 EVIDENCE ON SENTENCING, VISCERAL REACTIONS TO THE CHARGED ACTS, PRECONCEIVED NOTIONS OF GUILT, AND DETAILED KNOWLEDGE OF UNCHARGED MISCONDUCT THAT HAD BEEN EXCLUDED, DENIED SGT AKBAR A FAIR TRIAL.
A.V
THE MILITARY JUDGED ERRED TO SGT AKBAR’S SUBSTANTIAL PREJUDICE BY DENYING HIS MOTION FOR CHANGE OF VENUE.
A. VI
SGT AKBAR WAS DENIED HIS SIXTH AND EIGHTH AMENDMENT RIGHT TO COUNSEL WHEN HIS TRIAL DEFENSE COUNSEL ACTIVELY REPRESENTED CONFLICTING INTERESTS WHICH ADVERSELY AFFECTED THEIR PERFORMANCE.
AVII
“WHERE [UNLAWFUL COMMAND INFLUENCE] IS FOUND TO EXIST, JUDICIAL AUTHORITIES MUST TAKE THOSE STEPS NECESSARY TO PRESERVE BOTH THE ACTUAL AND APPARENT FAIRNESS OF THE CRIMINAL PROCEEDING.” UNITED STATES v. LEWIS, 63 M.J. 405, 407 (C.A.A.F.2006). PROSECUTORIAL MISCONDUCT IS “ACTION OR INACTION BY A PROSECUTOR IN VIOLATION OF SOME LEGAL NORM OR STANDARD, e.g., A CONSTITUTIONAL PROVISION, A STATUTE, A MANUAL RULE, OR AN APPLICABLE PROFESSIONAL ETHICS CANON.” UNITED STATES v. MEEK, 44 M.J. 1, 6 (C.A.A.F.1996). IN THIS CASE, GOVERNMENT COUNSEL MANIPULATED THE DUTY ASSIGNMENTS OF SGT AKBAR’S TRIAL DEFENSE COUNSEL TO AVOID TRIAL DELAY AND THEREBY CREATED A CONFLICT OF INTERESTS. See A.E. VI, SEC. E. DID GOVERNMENT COUNSEL’S ACTIONS AMOUNT TO UNLAWFUL COMMAND INFLUENCE OR PROSECUTORIAL MISCONDUCT IN VIOLATION OF SGT AKBAR’S RIGHT TO DUE PROCESS?
AVIII
STANDARDS APPLICABLE TO FEDERAL AND STATE CAPITAL DEFENSE COUNSEL HAVE APPLICABILITY TO COURTS-MARTIAL AS RELEVANT STANDARDS OF CARE AND THE ARMY COURT’S ANALYSIS OF SGT AKBAR’S CASE WAS FLAWED BECAUSE OF ITS MISAPPLICATION OF THE GUIDELINES AND ITS DETERMINATION COUNSEL WERE ‘WELL-QUALIFIED.”
AIX
DENYING SGT AKBAR THE RIGHT TO PLEAD GUILTY UNCONSTITUTIONALLY LIMITED HIS RIGHT TO PRESENT MITIGATION EVIDENCE. IN THE ALTERNATIVE, COUNSEL’S FAILURE TO DEMAND AN INSTRUCTION ON THIS LIMITATION OF MITIGATION PRESENTATION AMOUNTED TO [INEFFECTIVE ASSISTANCE OF COUNSEL] AS OMISSION OF THE INSTRUCTION DENIED SGT AKBAR MITIGATION EVIDENCE IN VIOLATION OF THE EIGHTH AMENDMENT.
A.X
THE SECRETARY OF THE ARMY’S EXEMPTION FROM COURT-MARTIAL SERVICE OFFICERS OF THE SPECIAL BRANCHES NAMED IN AR 27-10 VIOLATED ARTICLE 25(d)(2), UCMJ, PREJUDICING SGT AKBAR’S RIGHT TO DUE PROCESS AND A FAIR TRIAL.
A.XI
AS SGT AKBAR’S TRIAL DEFENSE COUNSEL DID NOT ADEQUATELY INVESTIGATE HIS CASE, THE ARMY COURT ERRED DENYING HIS REQUEST TO RETAIN PSYCHIATRIST AND PSYCHOLOGIST DR. RICHARD DUDLEY AND DR. JANICE STEVENSON, OR OTHERWISE, ORDERING PROVISION OF ADEQUATE SUBSTITUTES. FURTHER INVESTIGATION BY APPELLATE DEFENSE COUNSEL ALSO REVEALS THE NECESSITY OF OBTAINING THE EXPERT ASSISTANCE OF CLINICAL PSYCHOLOGIST DR. WILBERT MILES.
*411 A.XII
THE MILITARY JUDGE COMMITTED PLAIN ERROR BY PROVIDING SENTENCING RECONSIDERATION INSTRUCTIONS THAT FAILED TO INSTRUCT THE PANEL DEATH WAS NO LONGER AN AVAILABLE PUNISHMENT IF THE PANEL’S INITIAL VOTE DID NOT INCLUDE DEATH AND DID NOT COMPLY WITH R.C.M. 1004.
A.XIII
THE MILITARY JUDGE ERRED IN NOT SUPPRESSING THE STATEMENT “YES” BY SGT AKBAR TO MAJ WARREN, WHEN THAT STATEMENT WAS GIVEN WHILE SGT AKBAR WAS AT GUNPOINT, IN CUSTODY, AND BEFORE HE RECEIVED RIGHTS WARNINGS UNDER MIRANDA v. ARIZONA OR ARTICLE 31(b), UCMJ.
A.XIV
UNDER THE SUPREME COURT’S REASONING IN RING v. ARIZONA 536 U.S. 584, 122 S.Ct. 2428, 153 L.Ed.2d 556 (2002), CONGRESS UNCONSTITUTIONALLY DELEGATED TO THE PRESIDENT THE POWER TO ENACT ELEMENTS OF CAPITAL MURDER, A PURELY LEGISLATIVE FUNCTION.
A.XV
DID THE PROCEDURES PROVIDED UNDER R.C.M. 1004 VIOLATE SGT AKBAR’S RIGHT TO DUE PROCESS BY ALLOWING THE CONVENING AUTHORITY TO UNILATERALLY APPEND UNSWORN AND UNINVESTIGATED AGGRAVATING ELEMENTS TO HIS MURDER SPECIFICATIONS AT REFERRAL?
A.XVT
‘WHEN A FINDING OF FACT ALTERS THE LEGALLY PRESCRIBED PUNISHMENT SO AS TO AGGRAVATE IT, THE FACT NECESSARILY FORMS A CONSTITUENT PART OF A NEW OFFENSE AND MUST BE SUBMITTED TO THE JURY.” ALLEYNE [v. UNITED STATES], [— U.S. -,] 133 S.CT. [2151] AT 2162 [186 L.ED.2d 314 (2013)]. UNDER R.C.M. 1004(b)(4)(C), DEATH CANNOT BE CONSIDERED ABSENT A PRELIMINARY, UNANIMOUS FINDING THAT AGGRAVATING CIRCUMSTANCES “SUBSTANTIALLY OUTWEIGH” MITIGATING AND' EXTENUATING CIRCUMSTANCES. AT TRIAL, SGT AKBAR UNSUCCESSFULLY REQUESTED SENTENCING INSTRUCTIONS REQUIRING THAT AGGRAVATING CIRCUMSTANCES OUTWEIGH MITIGATING AND EXTENUATING CIRCUMSTANCES BEYOND A REASONABLE DOUBT PURSUANT TO APPRENDI, 530 U.S. 466 [120 S.Ct. 2348] AND RING, 536 U.S. 584 [122 S.Ct. 2428]. DID THE MILITARY JUDGE VIOLATE SGT AKBAR’S RIGHT TO DUE PROCESS BY FAILING TO INSTRUCT THAT AGGRAVATING CIRCUMSTANCES MUST OUTWEIGH MITIGATING CIRCUMSTANCES BEYOND A REASONABLE DOUBT?
AXVII
THE LACK OF A SYSTEM TO ENSURE CONSISTENT AND EVEN-HANDED APPLICATION OF THE DEATH PENALTY IN THE MILITARY VIOLATES BOTH SGT AKBAR’S EQUAL PROTECTION RIGHTS AND ARTICLE 36, UCMJ. See 18 U,S.C. § 2245 AND U.S. DEP’T OF JUSTICE, U.S. ATTORNEYS MANUAL § 9-10.010 (JUNE 1998) (USAM) AND 10 U.S.C. § 949a(b)(2)(C)(ii). IN CONTRAST TO THE USAM, NO PROTOCOL EXISTS FOR CONVENING AUTHORITIES IN CAPITAL CASES, CREATING AN AD HOC SYSTEM OF CAPITAL SENTENCING.
A.XVIII
SGT AKBAR’S DEATH SENTENCE VIOLATES THE EIGHTH AMENDMENT BECAUSE APPELLANT’S SEVERE MENTAL' ILLNESS MAKES SUCH A PUNISHMENT HIGHLY DISPROPORTIONATE TO HIS CULPABILITY AND VIOLATES THE FIFTH AMENDMENT BECAUSE IT WOULD BE A DENIAL OF DUE PROCESS TO EXECUTE HIM.
A.XIX
THE MILITARY JUDGE ERRED IN ADMITTING THE GOVERNMENT’S CRIME *412 SCENE PHOTOGRAPHS AS THEY UNDULY PREJUDICED SGT AKBAR’S FIFTH AND EIGHTH AMENDMENT RIGHT TO DUE PROCESS. See, e.g., APP. EXS. 157, 299.
A.XX
THE TRIAL COUNSEL COMMITTED REVERSIBLE ERROR BY USING THE VOIR DIRE OF THE MEMBERS TO IM-PERMISSIBLY ADVANCE THE GOVERNMENT’S THEORY OF THE CASE. See APP. EX. VII (DEFENSE MOTION FOR APPROPRIATE RELIEF FOR INDIVIDUAL SEQUESTRATION OF MEMBERS DURING VOIR DIRE); See R.C.M. 912(d), DISCUSSION.
A.XXI
THE MILITARY JUSTICE SYSTEM’S PEREMPTORY CHALLENGE PROCEDURE, WHICH ALLOWS THE GOVERNMENT TO REMOVE ANY ONE MEMBER WITHOUT CAUSE, IS AN UNCONSTITUTIONAL VIOLATION OP THE FIFTH AND EIGHTH AMENDMENTS TO THE U.S. CONSTITUTION IN CAPITAL CASES, WHERE THE PROSECUTOR IS FREE TO REMOVE A MEMBER WHOSE MORAL BIAS AGAINST -THE DEATH PENALTY DOES NOT JUSTIFY A CHALLENGE FOR CAUSE. But see UNITED STATES v. CURTIS, 44 M.J. 106, 131-33 (C.A.A.F.1996); UNITED STATES v. LOVING, 41 M.J. 213, 294-96 (C.A.A.F.1994).
A.XXII
THE PANEL’S RECONSIDERATION OF THE SENTENCE IN SGT AKBAR’S CASE VIOLATED THE FIFTH AMENDMENT’S DOUBLE JEOPARDY CLAUSE BECAUSE “NO PERSON ... SHALL BE SUBJECT FOR THE SAME OFFENSE TO BE TWICE PUT IN JEOPARDY OP LIFE.” See APP. EX. XXXVTI (DEFENSE MOTION FOR APPROPRIATE RELIEF-FINDING ' AND SENTENCING INSTRUCTIONS EXPLAINING VOTING PROCEDURE ON CAPITAL OFFENSES AND DEATH).
B.I
THE ARMY COURT’S FAILURE TO DO AN ARTICLE 66(c), UCMJ, PROPORTIONALITY REVIEW REQUIRES REMAND FOR THE COMPLETE REVIEW IT WAS REQUIRED BY LAW TO CONDUCT, AND THE FAILURE TO DETAIL ITS REVIEW IN ITS OPINION UNDERMINES THIS COURT’S ABILITY TO REVIEW THE PROPORTIONALITY ANALYSIS UNDER ARTICLE 67, UCMJ.
B.II
THE ARMY COURT’S REFUSAL TO ACCEPT SGT AKBAR’S EVIDENCE IN REBUTTAL TO GOV’T APP. EX. 13, A DECLARATION FROM TRIAL DEFENSE COUNSEL, AND REFUSAL TO GRANT THE FEW WEEKS NECESSARY TO OBTAIN DISCOVERY NOT PROVIDED AS ORDERED IN 2008, REQUIRES REMAND FOR A COMPLETE REVIEW UNDER ARTICLE 66, UCMJ, BECAUSE (1) THE ARMY COURT WAS REQUIRED BY LAW TO CONDUCT THE REVIEW, AND (2) THIS COURT DOES NOT HAVE FACT FINDING ABILITY UNDER ARTICLE 67, UCMJ.
B.III
THE 2,633 DAY GAP BETWEEN THE COMPLETION OF SGT AKBAR’S COURT-MARTIAL AND THE ARMY COURT’S DECISION WAS FACIALLY UNREASONABLE AND REQUIRES REMAND TO DETERMINE IF SGT AKBAR WAS PREJUDICIALLY DENIED THE DUE PROCESS OF LAW GUARANTEED UNDER THE FIFTH AMENDMENT.
B.IV
THE ARMY COURT ERRED ALLOWING TRIAL DEFENSE COUNSEL TO FILE A JOINT AFFIDAVIT OVER SGT AKBAR’S OBJECTION, DEPRIVING HIM OF THE INDEPENDENT RECOLLECTIONS OF BOTH COUNSEL AND DELEGATING THE ARMY COURT’S FACT FINDING RESPONSIBILITY TO HIS TRIAL DEFENSE TEAM WHO NOW STAND OPPOSED TO SGT AKBAR’S INTERESTS. B.V
“ELIGIBILITY FACTORS ALMOST OF NECESSITY REQUIRE AN ANSWER TO *413 A QUESTION WITH A FACTUAL NEXUS TO THE CRIME OR THE DEFENDANT SO AS TO ‘MAKE RATIONALLY RENEWABLE THE PROCESS FOR IMPOSING A SENTENCE OF DEATH.’” ARAVE v. CREECH, 507 U.S. 463, 471 [113 S.Ct. 1534, 123 L.Ed.2d 188] (1993) (CITATION OMITTED). IN THIS CASE, THE SOLE AGGRAVATING FACTOR RELIED UPON BY THE PANEL TO FIND SGT AKBAR DEATH ELIGIBLE WAS THAT, HAVING BEEN FOUND GUILTY OF PREMEDITATED MURDER, IN VIOLATION OF ARTICLE 118(1), UCMJ, THE ACCUSED WAS FOUND GUILTY, IN THE SAME CASE, OF ANOTHER VIOLATION OF ARTICLE 118, UCMJ, PURSUANT TO R.C.M. 1004(c)(7)(J). IS THE AGGRAVATING FACTOR PROVIDED IN R.C.M. 1004(c)(7)(J) UNCONSTITUTIONALLY VAGUE BECAUSE IT IS NOT DIRECTED AT A SINGLE EVENT AND DEPENDANT UPON THE GOVERNMENT’S DECISION TO PROSECUTE TWO OR MORE VIOLATIONS OF ARTICLE 118, UCMJ, AT A SINGLE TRIAL?
B.VI
THE CUMULATIVE ERRORS IN THIS CASE COMPEL REVERSAL OF THE FINDINGS AND SENTENCE.
B.VII
RULE FOR COURTS-MARTIAL (R.C.M.) 1004 DOES NOT ENSURE THE GOALS OF INDIVIDUAL FAIRNESS, REASONABLE CONSISTENCY, AND ABSENCE OF ERROR NECESSARY TO ALLOW THIS COURT TO AFFIRM APPELLANT’S DEATH SENTENCE BECAUSE R.C.M. 1004 DOES NOT ENSURE THE RACE OF THE VICTIM OR ALLEGED PERPETRATOR IS NOT A FACTOR IN THE DEATH SENTENCE. McCLESKEY v. KEMP, 481 U.S. 279 [107 S.Ct. 1756, 95 L.Ed.2d 262] (1987).
B.VIII
THE VARIABLE SIZE OF THE COURT-MARTIAL PANEL CONSTITUTED AN UNCONSTITUTIONAL CONDITION ON SERGEANT AKBAR’S FUNDAMENTAL RIGHT TO CONDUCT VOIR DIRE AND PROMOTE AN IMPARTIAL PANEL. See APP. EX. XXIII (DEFENSE MOTION FOR APPROPRIATE RELIEF — GRANT OF ADDITIONAL PEREMPTORY CHALLENGES); IRVIN v. DOWD, 366 U.S. 717, 722 [81 S.Ct. 1639, 6 L.Ed.2d 751] (1961).
B.IX
THE DEATH SENTENCE IN THIS CASE VIOLATES THE FIFTH, SIXTH, AND EIGHTH AMENDMENTS AND ARTICLE 55, UCMJ, BECAUSE THE MILITARY SYSTEM DOES NOT GUARANTEE A FIXED NUMBER OF MEMBERS. See APP. EX. XXIII (DEFENSE MOTION FOR APPROPRIATE RELIEF — GRANT OF ADDITIONAL PEREMPTORY CHALLENGES); See also APP. EX. LXXXIII (DEFENSE MOTION FOR APPROPRIATE RELIEF TO PRECLUDE THE COURT-MARTIAL FROM ADJUDGING A SENTENCE OF DEATH SINCE THE MANUAL FOR COURTS-MARTIAL FAILS TO MANDATE A FIXED SIZE PANEL IN CAPITAL CASES); IRVIN v. DOWD, 366 U.S. 717, 722 [81 S.Ct. 1639, 6 L.Ed.2d 751] (1961).
B.X
DISCUSSION OF FINDINGS AND SENTENCING INSTRUCTIONS AT R.C.M. 802 CONFERENCES DENIED SGT AKBAR HIS RIGHT TO BE PRESENT AT EVERY STAGE OF TRIAL. See APP. EX. XLVII (DEFENSE MOTION FOR APPROPRIATE RELIEF — REQUEST THAT ALL CONFERENCES BE HELD IN AN ARTICLE 39(a)).
B.XI
THIS COURT ARBITRARILY AND SEVERELY RESTRICTED THE LENGTH OF SGT AKBAR’S BRIEF, IN VIOLATION OF THE EQUAL PROTECTION AND DUE PROCESS CLAUSES OF THE FOURTEENTH AMENDMENT AND ARTICLE 67, WHEN THIS COURT ORDERED SGT AKBAR TO FILE AN ABBREVIATED BRIEF, INCONSISTENT WITH THE PAST PRACTICE OF THIS COURT IN CAPITAL CASES AND ARTI *414 CLE 67, AND WITHOUT GOOD CAUSE SHOWN.
C.I
THE ROLE OF THE CONVENING AUTHORITY IN THE MILITARY JUSTICE SYSTEM DENIED SGT.AKBAR A FAIR AND IMPARTIAL TRIAL IN VIOLATION OF THE FIFTH, SIXTH, AND EIGHTH AMENDMENTS AND ARTICLE 55, UCMJ, BY ALLOWING THE CONVENING AUTHORITY TO ACT AS A GRAND JURY IN REFERRING CAPITAL CRIMINAL OASES TO TRIAL, PERSONALLY APPOINTING MEMBERS OF HIS CHOICE, RATING THE MEMBERS, HOLDING THE ULTIMATE LAW ENFORCEMENT FUNCTION WITHIN HIS COMMAND, RATING HIS LEGAL AD-VISOR, AND ACTING AS THE FIRST LEVEL OF APPEAL, THUS CREATING AN APPEARANCE OF IMPROPRIETY THROUGH A PERCEPTION THAT HE ACTS AS' PROSECUTOR, JUDGE, AND JURY. See APP. EX. XIII (DEFENSE .MOTION FOR APPROPRIATE RELIEF TO DISQUALIFY ALL MEMBERS CHOSEN BY THE CONVENING AUTHORITY).
C.II
ARTICLE 18, UCMJ, AND R.C.M. 201(f)(1)(C), WHICH REQUIRE TRIAL BY MEMBERS IN A CAPITAL CASE, VIOLATES THE GUARANTEE OF DUE PROCESS AND A RELIABLE VERDICT UNDER THE FIFTH, SIXTH, AND EIGHTH AMENDMENTS.
C.III
SERGEANT AKBAR WAS DENIED HIS RIGHT TO A TRIAL BY AN IMPARTIAL JURY COMPOSED OF A FAIR CROSS-SECTION OF THE COMMUNITY IN VIOLATION OF THE SIXTH AMENDMENT TO THE U.S. CONSTITUTION. DUREN v. MISSOURI, 439 U.S. 357 [99 S.Ct. 664, 58 L.Ed.2d 579] (1979). But see UNITED STATES v. CURTIS, 44 M.J. 106, 130-33 (C.A.A.F.1996).
C.IV
THE SELECTION OF' THE PANEL MEMBERS BY THE CONVENING AUTHORITY IN A CAPITAL CASE DIRECTLY VIOLATES SGT AKBAR’S RIGHTS UNDER THE FIFTH, SIXTH, AND EIGHTH AMENDMENTS TO THE U.S. CONSTITUTION AND ARTICLE 55, UCMJ, BY IN EFFECT GIVING THE GOVERNMENT UNLIMITED PEREMPTORY CHALLENGES. See APP. EX. XIII (DEFENSE MOTION FOR APPROPRIATE RELIEF TO DISQUALIFY ALL MEMBERS CHOSEN BY THE CONVENING AUTHORITY).
C.V
THE PRESIDENT EXCEEDED HIS ARTICLE 36 POWERS TO ESTABLISH PROCEDURES FOR COURTS-MARTIAL BY GRANTING TRIAL COUNSEL A PEREMPTORY CHALLENGE AND THEREBY THE POWER TO NULLIFY THE CONVENING AUTHORITY’S ARTICLE 25(d) AUTHORITY TO DETAIL MEMBERS OF THE COURT. See APP. EX. XXIII (DEFENSE MOTION FOR APPROPRIATE RELIEF — GRANT OF ADDITIONAL PEREMPTORY CHALLENGES).
C.VI
THE DESIGNATION OF THE SENIOR MEMBER AS PRESIDING OFFICER FOR DELIBERATIONS - DENIED SGT AKBAR A FAIR TRIAL BEFORE IMPARTIAL MEMBERS IN VIOLATION OF THE FIFTH, SIXTH, AND EIGHTH AMENDMENTS TO THE U.S. CONSTITUTION AND ARTICLE 55, UCMJ. See APP. EX. XXV (DEFENSE MOTION FOR APPROPRIATE RELIEF — REQUEST THAT THE SENIOR MEMBER NOT BE MADE THE PRESIDENT OF THE PANEL).
C.VII
THE DENIAL OF THE RIGHT TO POLL MEMBERS REGARDING THEIR VERDICT AT EACH STAGE OF TRIAL DENIED SERGEANT AKBAR A FAIR TRIAL BEFORE IMPARTIAL MEMBERS IN VIOLATION OF THE FIFTH, SIXTH, AND EIGHTH AMENDMENTS TO THE U.S. CONSTITUTION AND ARTICLE 55, UCMJ. See APP. EX. XVII (DEFENSE *415 MOTION FOR APPROPRIATE RELIEF-POLLING OF PANEL MEMBERS).
C.VHI
THERE IS NO MEANINGFUL DISTINCTION BETWEEN PREMEDITATED AND UNPREMEDITATED MURDER ALLOWING 'DIFFERENTIAL ■ TREATMENT AND SENTENCING DISPARITY IN VIOLATION OF THE FIFTH, SIXTH, AND EIGHTH AMENDMENTS TO THE U.S. CONSTITUTION AND ARTICLE 55, UCMJ. See APP. EX. LIX (DEFENSE MOTION TO DISMISS THE CAPITAL REFERRAL DUE TO ARTICLE 118 OF THE UCMJ BEING UNCONSTITUTIONALLY VAGUE).
C.IX
SERGEANT AKBAR WAS DENIED HIS CONSTITUTIONAL RIGHT UNDER THE FIFTH AMENDMENT TO A GRAND JURY PRESENTMENT OR INDICTMENT. See APP. EX. LXIX (DEFENSE MOTION TO DISMISS CAPITAL REFERRAL ON THE GROUND THAT THE MILITARY CAPITAL SCHEME VIOLATES THE FIFTH AMENDMENT).
C.X
COURT-MARTIAL PROCEDURES DENIED SGT AKBAR HIS ARTICLE III RIGHT TO A JURY TRIAL. SOLORIO v. UNITED STATES, 103 [483] U.S. 435, 453-54 [107 S.Ct. 2924, 97 L.Ed.2d 364] (1987) (MARSHALL, J., DISSENTING). But see UNITED STATES v. CURTIS, 44 M.J. 106, 132 (C.A.A.F.1996).
C.XI
DUE PROCESS REQUIRES TRIAL AND INTERMEDIATE APPELLATE JUDGES IN MILITARY DEATH PENALTY CASES BE PROTECTED BY A FIXED TERM OF OFFICE, NOT SUBJECT TO INFLUENCE AND CONTROL BY THE JUDGE ADVOCATE GENERAL OF THE ARMY. See APP. EX. V (DEFENSE MOTION FOR APPROPRIATE RELIEF, HEIGHTENED DUE PROCESS). Blit see UNITED STATES v. LOVING, 41 M.J. 213, 295 (C.A.A.F.1994).
C.XII
THE ARMY COURT LACKED JURISDICTION BECAUSE THE JUDGES ARE PRINCIPAL OFFICERS NOT PRESI-DENTIALLY APPOINTED AS REQUIRED BY THE APPOINTMENTS CLAUSE OF THE CONSTITUTION. See U.S. CONST., ART. II, § 2. But see UNITED STATES v. GRINDSTAFF, 45 M.J. 634 (N.-M.CT.CRIM.APP.1997); cf. EDMOND v. UNITED STATES, 115 [520] U.S. 651 [117 S.Ct. 1573, 137 L.Ed.2d 917] (1997).
C.XIII
THIS COURT LACKS THE JURISDICTION AND AUTHORITY TO REVIEW THE CONSTITUTIONALITY OF THE RULES FOR COURTS-MARTIAL AND THE UCMJ BECAUSE THIS COURT IS AN ARTICLE I COURT, NOT AN ARTICLE III COURT WITH THE POWER TO CHECK THE LEGISLATIVE EXECUTIVE BRANCHES UNDER MARBURY v. MADISON, 5 U.S. (1 CRANCH) 137 [2 L.Ed. 60] (1803). See also COOPER v. AARON, 358 U.S. 1 [78 S.Ct. 1401, 3 L.Ed.2d 5] (1958) (THE POWER TO STRIKE DOWN UNCONSTITUTIONAL STATUTES OR EXECUTIVE ORDERS IS EXCLUSIVE TO ARTICLE III COURTS). But see LOVING, 41 M.J. AT 296.
C.XIV
SERGEANT AKBAR IS DENIED EQUAL PROTECTION OF LAW IN VIOLATION OF THE FIFTH AMENDMENT AS ALL U.S. CIVILIANS ARE AFFORDED THE OPPORTUNITY TO HAVE THEIR CASES REVIEWED BY AN ARTICLE III COURT, BUT MEMBERS OF THE UNITED STATES MILITARY BY VIRTUE OF THEIR STATUS AS SERVICE MEMBERS ARE NOT. But see UNITED STATES v. LOVING, 41 M.J. 213, 295 (C.A.A.F.1994).
C.XV
SERGEANT AKBAR IS DENIED EQUAL PROTECTION OF LAW UNDER THE FIFTH AMENDMENT TO THE U.S. CONSTITUTION BECAUSE [IN ACCORDANCE WITH] ARMY REGULATION 15-130, PARA. 3-l(d)(6), HIS APPROVED *416 DEATH SENTENCE RENDERS HIM INELIGIBLE FOR CLEMENCY BY THE ARMY CLEMENCY AND PAROLE BOARD, WHILE ALL OTHER CASES REVIEWED BY THIS COURT ARE ELIGIBLE FOR SUCH CONSIDERATION. But see UNITED STATES v. THOMAS, 43 M.J. 650, 607 (N.-M.CT.CRIM.APP.1995).
C.XVI
SERGEANT AKBAR’S DEATH SENTENCE VIOLATES THE EIGHTH AMENDMENT PROHIBITION AGAINST CRUEL AND UNUSUAL PUNISHMENT BECAUSE THE CAPITAL REFERRAL SYSTEM OPERATES IN AN ARBITRARY AND CAPRICIOUS MANNER. See APP. EX. LXV (DEFENSE MOTION TO SET ASIDE CAPITAL REFERRAL FOR LACK OF STATUTORY GUIDELINES).
C.XVTI
THE DEATH PENALTY PROVISION OF ARTICLE 118, UCMJ, IS UNCONSTITUTIONAL AS IT RELATES TO TRADITIONAL COMMON LAW CRIMES THAT OCCUR IN THE U.S. But see UNITED STATES v. LOVING, 41 M.J. 213, 293 (C.A.A.F.1994). THE COURT RESOLVED THE ISSUE AGAINST PRIVATE LOVING, ADOPTING THE REASONING OF THE DECISION OF THE ARMY COURT OF MILITARY REVIEW. See UNITED STATES v. LOVING, 34 M.J. 956, 967 (A.C.M.R.1992). HOWEVER, PRIVATE LOVING’S ARGUMENT BEFORE THE ARMY COURT RELIED ON THE TENTH AMENDMENT AND NECESSARY AND PROPER CLAUSE OF THE U.S. CONSTITUTION. Id. SERGEANT AKBAR’S ARGUMENT RELIES ON THE EIGHTH AMENDMENT TO THE U.S. CONSTITUTION.
C.XVIII.
THE DEATH SENTENCE IN THIS CASE VIOLATES THE FIFTH AND EIGHTH AMENDMENTS TO THE U.S. CONSTITUTION AND ARTICLE 55, UCMJ, AS THE CONVENING AUTHORITY DID NOT DEMONSTRATE HOW THE DEATH PENALTY WOULD ENHANCE GOOD ORDER AND DISCIPLINE. See APP. EX. LXVII (DEFENSE MOTION FOR APPROPRIATE RELIEF TO PRECLUDE IMPOSITION OF DEATH AS INTERESTS OF JUSTICE WILL NOT BE SERVED).
C.XIX
THE MILITARY CAPITAL SENTENCING PROCEDURE IS UNCONSTITUTIONAL BECAUSE MILITARY JUDGES DO NOT HAVE THE POWER TO ADJUST OR SUSPEND A DEATH SENTENCE IMPROPERLY IMPOSED. See APP. EX. V (DEFENSE MOTION FOR APPROPRIATE RELIEF, HEIGHTENED DUE PROCESS).
C.XX
DUE TO THE MILITARY JUSTICE SYSTEM’S INHERENT FLAWS CAPITAL PUNISHMENT AMOUNTS TO CRUEL AND UNUSUAL PUNISHMENT UNDER ALL CIRCUMSTANCES. See APP. EX. LXXI (DEFENSE MOTION FOR APPROPRIATE RELIEF TO PRECLUDE THE COURT-MARTIAL FROM ADJUDGING A SENTENCE IN VIOLATION OF ARTICLE 55 OF THE UCMJ).
C.XXI
THE DEATH PENALTY CANNOT BE CONSTITUTIONALLY IMPLEMENTED UNDER CURRENT EIGHTH AMENDMENT JURISPRUDENCE. See CALLINS v. COLLINS, 510 U.S. 1141, 1143-59 [114 S.Ct. 1127, 127 L.Ed.2d 435] (1994) (BLACKMUN, J., DISSENTING) (CERT. DENIED).
C.XXII
R.C.M. 1209 AND THE MILITARY DEATH PENALTY SYSTEM DENY DUE PROCESS AND CONSTITUTE CRUEL AND UNUSUAL PUNISHMENT AND ARE TANTAMOUNT TO FORESEEABLE, STATE-SPONSORED EXECUTION OF INNOCENT HUMAN BEINGS BECAUSE THERE IS NO EXCEPTION FOR ACTUAL INNOCENCE TO THE FINALITY OF COURTS-MARTIAL REVIEW. Cf. TRIESTMAN v. UNITED STATES, 124 F.3d 361, 378-79 (2d CIR.1997).
*417 C.XXIII
R.C.M. 1001(b)(4) IS UNCONSTITUTIONALLY VAGUE AND OVERBROAD AS APPLIED TO THE APPELLATE AND CAPITAL SENTENCING PROCEEDINGS BECAUSE IT PERMITS THE INTRODUCTION OF EVIDENCE BEYOND THAT OF DIRECT FAMILY MEMBERS AND THOSE PRESENT AT THE SCENE IN VIOLATION OF THE FIFTH AND EIGHTH AMENDMENTS. See APP. EX. LV (DEFENSE MOTION FOR APPROPRIATE RELIEF — TO LIMIT ADMISSIBILITY OF VICTIM’S CHARACTER AND IMPACT ON FAMILY FROM VICTIM’S DEATH); See also APP. EX. 296 (MOTION FOR APPROPRIATE RELIEF — LIMIT VICTIM IMPACT AND GOVERNMENT ARGUMENT).
C.XXIV
R.C.M. 1001(b)(4) IS UNCONSTITUTIONALLY VAGUE AND OVERBROAD AS APPLIED TO THE APPELLATE AND CAPITAL SENTENCING PROCEEDINGS BECAUSE IT PERMITS THE INTRODUCTION OF CIRCUMSTANCES WHICH COULD NOT REASONABLY HAVE BEEN KNOWN BY SERGEANT AKBAR AT THE TIME OF THE OFFENSE IN VIOLATION OF HIS FIFTH AND EIGHTH AMENDMENT RIGHTS. See APP. EX. LV (DEFENSE MOTION FOR APPROPRIATE RELIEF — TO LIMIT ADMISSIBILITY OF VICTIM’S CHARACTER AND IMPACT ON FAMILY FROM VICTIM’S DEATH).
C.XXV
THE MILITARY JUDGE ERRED IN ADMITTING VICTIM-IMPACT EVIDENCE REGARDING THE PERSONAL CHARACTERISTICS OF THE VICTIMS WHICH COULD NOT REASONABLY HAVE BEEN KNOWN BY SERGEANT AKBAR AT THE TIME OF THE OFFENSE IN VIOLATION OF HIS FIFTH AND EIGHTH AMENDMENT RIGHTS. See APP. EX. LV (DEFENSE MOTION FOR APPROPRIATE RELIEF — TO LIMIT ADMISSIBILITY OF VICTIM’S CHARACTER AND IMPACT ON FAMILY FROM VICTIM’S DEATH).
C.XXVI
THE DEATH SENTENCE IN THIS CASE VIOLATES THE EX POST FACTO CLAUSE, FIFTH AND EIGHTH AMENDMENTS, SEPARATION OF POWERS DOCTRINE, PREEMPTION DOCTRINE, AND ARTICLE 55, UCMJ, BECAUSE WHEN IT WAS ADJUDGED NEITHER CONGRESS NOR THE ARMY SPECIFIED A MEANS OR PLACE OF EXECUTION. See APP. EX. LXXIII (DEFENSE MOTION TO DISMISS — MILITARY SYSTEM FOR ADMINISTERING THE DEATH PENALTY VIOLATES THE NON-DELEGATION DOCTRINE).
Issues Presented Pursuant to United States v. Grostefon, 12 M.J. 431 (C.M.A.1982)
I.
WHETHER THERE WAS A FRAUD ON THE COURT WHERE TWO WITNESSES TESTIFIED DIFFERENTLY AT TRIAL THAN AT THEIR ARTICLE 32 HEARING AND WHERE FORENSIC ANALYSIS OF THE BULLETS SHOWED THEY WERE ARMOR PIERCING WHERE APPELLANT ONLY WAS ISSUED STANDARD ISSUE BULLETS.
II.
WHETHER APPELLANT WAS ABLE TO ASSIST COUNSEL AT TRIAL.
III.
WHETHER THE BULLET ANALYSIS WAS A SHAM.
IV.
WHETHER THE PANEL AND THE MILITARY JUDGE WERE BIASED AGAINST APPELLANT.
V.
WHETHER SOMEONE USED MIND CONTROL ON APPELLANT TO FORCE HIM TO ATTACK.
VI.
WHETHER TRIAL DEFENSE COUNSEL COERCED APPELLANT NOT TO TESTIFY.
*418 VII.
WHETHER LEAD CIVILIAN COUNSEL SHOULD HAVE ACCEDED TO APPELLANT’S REQUEST TO REMOVE MILITARY DEFENSE COUNSEL.
VIII.
WHETHER APPELLANT WAS DENIED COUNSEL OF HIS CHOICE WHEN TRIAL DEFENSE COUNSEL REFUSED TO INVITE LTC HANSEN BACK AND CIVILIAN COUNSEL’S ' FAMILY WAS THREATENED FOR WORKING ON THE CASE.

. Appellant was not charged in the stabbing inci- ' dent. Also, as discussed below, Appellant's counsel successfully prevented the panel from considering this incident during the sentencing phase of Appellant’s trial.

. According to Dr. Woods, a differential diagnosis is based upon an individual’s symptoms and provides the possible disorders that would be consistent with the symptoms.

. A fragging is an incident in which an individual “deliberately injurefs] or kill[s] (one's military leader) by means of a fragmentation grenade.” Merriam-Webster Unabridged Online Dictionary, http://unabridged.merriam-webster.com/ unabridged/fragging (last visited Aug. 14, 2015).

. Appellant’s birth name was Mark Fidel Kools. His parents became members of the Nation of Islam, and Appellant's name was changed to Hasan Karim Akbar when Appellant was eight years old. Appellant enlisted in the Army under his birth name. However, he petitioned to change his name to Hasan Akbar in June 2001, and the Army finalized the name change in September 2001.

. The reconsideration instruction explained the process for the members to revote after reaching a sentence if a member proposed reconsideration, noting that the process was different depending on whether the proposal to reconsider related to increasing or decreasing the sentence. The instruction outlined the following process for determining whether the panel could reconsider and revote the sentence: (1) if the proposal was to increase the sentence, a majority of members had to vote by secret ballot in favor of reconsideration; (2) if the proposal was to decrease the sentence, one-fourth of the members had to vote in favor of reconsideration with a view to decrease the sentence; and (3) if the sentence reached was death, only one member vote was required to reconsider the sentence. If the required votes were not obtained for reconsideration, the instruction informed the members that they were to announce the original sentence without indicating whether it was the original or reconsidered sentence. But, if a sufficient number of votes were obtained for reconsideration, the instruction required the members to adhere to the military judge’s original instructions for proposing and determining an appropriate sentence.

. The assigned issues and personally asserted Grostefon issues, which we permitted Appellant to submit out of time, United States v. Akbar, 73 M.J. 242 (C.A.A.F.2014) (order), are listed in the Appendix to this decision.

. Such challenges have become the norm in death penalty appeals in both the civilian and military -criminal justice systems. See David D. Velloney, Balancing the Scales of Justice: Expanding Access to Mitigation Specialists in Military Death Penalty Cases, 170 Mil. L.Rev. 1, 18 & n. 81 (2001). The vast majority of ineffective assistance of counsel claims are unsuccessful. See Anne M. Voigts, Note, Narrowing the Eye of the Needle: Procedural Default, Habeas Reform, and Claims of Ineffective Assistance of Counsel, 99 Colum. L.Rev. 1103, 1118 (1999).

. Appellant complains about counsels' failure to interview a third cousin, Kimberly Vines, but we agree with the Government that her claim about having no recollection of an interview is simply "too equivocal and ambiguous to overcome the presumption” of counsel's competence. United States v. Key, 57 M.J. 246, 249 (C.A.A.F.2002).

. Article 45, UCMJ, states, "A plea of guilty by the accused may not be received to any charge or specification alleging an offense for which the death penalty may be adjudged.” Article 45(b), UCMJ, 10 U.S.C. § 845(b) (2000).

. Appellant also claims that counsel were ineffective for failing to seek a change in venue. The record reflects that counsel sought to change venue but failed to convince the military judge of the need to do so. As a result, counsels' attempt to change venue means that they were not ineffective for failing to do so.

. See Eric R. Carpenter, An Overview of the Capital Jury Project for Military Justice Practitioners: Jury Dynamics, Juror Confusion, and Juror Responsibility, 2011 Army Law 6, 8-10, 13-16 & nn. 28, 46-47 (May 2011).

.As discussed infra, we do not find a sufficient basis to conclude that any of the panel members should have been disqualified for cause, so counsel were not ineffective for failing to challenge members for bias.

. The "frontloading'1 of mitigation evidence during the merits phase is reasonable where the same fact-finder (1) considers guilt and penalty evidence and (2) is instructed about the ability to consider all evidence for mitigation. See Pinholster, 131 S.Ct. at 1408 (citing Woodford v. Visciotti, 537 U.S. 19, 25, 123 S.Ct. 357, 154 L.Ed.2d 279 (2002)); Bell v. Cone, 535 U.S. 685, 699, 122 S.Ct. 1843, 152 L.Ed.2d 914 (2002) (rejecting ineffective sentence claim for failure to present testimony of medical experts at penalty phase where "compelling mitigating evidence” admitted during guilt phase); Curtis, 44 M.J. at 119 ("Mitigating evidence may ... be introduced at both the findings and the sentencing stages of a capital trial.”); Eaton v. Wilson, No. 09-CV-261-J, 2014 U.S. Dist. LEXIS 163567, at *398-*99, 2014 WL 6622512, *149-*50 (D.Wyo. Nov. 20, 2014) (explaining that "if the jury knows nothing about the defendant other than the facts of the crime when it renders its verdict finding him guilty, the defense bears a very heavy burden to win them over to life in the second stage of trial”). Here, the military judge instructed the panel that it could "consider any matter in extenuation and mitigation, ... whether it was presented before or after findings.” Counsel therefore reasonably adopted a strategy of presenting mitigation evidence during the guilt phase.

. For instance, in the diary entries from the two months before Appellant's attack, Appellant wrote (1) "I am in no condition to take care of a family and when I leave the Army, I may be homeless. I pace, daydream, and talk to myself everyday. And I am alone with very little chance of finding a mate.”; and (2) “I am a loser. That is just the truth. Eveiything I have tried to work for I don't have. A wife, good job, Self-respect." Throughout the thirteen years that Appellant kept the diary, his entries reflected his struggles as demonstrated by his thoughts about suicide, his low self-esteem, his problems staying awake, his isolation or loneliness, his problems having relationships with women, his sexual frustrations, his problematic relationships with his parents, and his problems maintaining employment.

. Besides these specific instructions, the military judge’s general sentencing instructions apprised the members of their duty to consider all evidence in the case, including that submitted in the binders. For instance, the military judge instructed the members that their deliberations on the aggravating factors "should properly include a full and free discussion on all of the evidence that has been presented.” (Emphasis added.) The military judge also instructed the members that they could consider "any matter in extenuation and mitigation, whether pre-offense or post-offense; whether it was presented before or after findings; and whether it was presented by the prosecution or the defense.” These general sentencing instructions informed the members that their sentencing deliberations were to be based on all the evidence, which included the defense sentencing exhibits the military judge permitted the members to take home. Finally, the military judge instructed the members of the importance of considering the evidence submitted in the binders when he listed the possible mitigating factors in the case, some of which explicitly referenced the evidence submitted in the binders, including Appellant's diary, Ms. Grey's interviews of individuals, the diary analy-ses by Ms. Grey and the FBI, and- the social service records.

. These factors are whether: (1) the facts alleged would result in relief; (2) the alleged facts are conclusory or speculative; (3) the parties agree on the facts; (4) the record "compellingly demonstrate[s] the improbability of” the allegations; and (5) Appellant adequately explains why an allegation contradicts a matter within the guilty plea record. Ginn, 47 M.J. at 248.

. Appellant supports his challenge to sentencing testimony by citing the testimony of the victims’ family members in United States v. Mitchell, 502 F.3d 931, 990 (9th Cir.2007), and DeRosa v. Workman, 679 F.3d 1196, 1240 (10th Cir.2012). We observe that much of the contested testimony in this case was made by the victims who were reporting their own reactions to the crime, so they did not constitute family member testimony about the crime or Appellant. We recognize that trial counsel elicited testimony by civilians about their reactions upon learning that a servicemem-ber was responsible for the attacks. To the extent that this testimony by the civilians was improper, we find no prejudice because it was brief and unlikely had any impact on the panel where the victims properly testified about their reactions upon learning that the perpetrator was a servieemember. See United States v. Davis, 609 F.3d 663, 685 (5th Cir.2010).

. Since neither the victim testimony nor trial counsels' sentencing argument was improper, we reject Appellant's related ineffective assistance of counsel claims.

. Appellant cites United States v. Harris, but the member in that case not only knew two victims but also rated the victims, was aware of the crimes, and chaired a committee to reduce the crime in question on base. 13 M.J. 288, 289 (C.M.A.1982). Neither COL GQ’s nor COL PM’s relationship with COL Hodges is nearly as close as the member’s relationship, with the victims in Harris. In United States v. Leonard, 63 M.J. 398, 403 (C.A.A.F.2006), we found implied bias where a member had a relationship "of trust” with a victim in a case in which the victim’s credibility was an issue. The record does not reflect a similar relationship of trust in this case or that COL Hodges’s credibility was at issue.

. When specifically asked by trial defense counsel about his views on Islam, LTC TG stated that Islam was a "male oriented religion” and a "passionate religion,” by which he meant that "sometimes you can’t think clearly and you take certain views that are selfish — -for your own selfish pleasures, self-desire instead of the good of the man.”

. Panel members are required to make four unanimous findings before imposing the death penalty: (1) the accused was guilty of an offense that authorized the imposition of the death penalty, R.C.M. 1004(a)(1) — (2); (2) one aggravating factor existed beyond a reasonable doubt, R.C.M. 1004(b)(7); (3) "the extenuating or mitigating circumstances [were] substantially outweighed by any aggravating circumstances,” R.C.M. 1004(b)(4)(C); and (4) the accused should be sentenced to death, R.C.M. 1006(d)(4)(A). See also United States v. Simoy, 50 M.J. 1, 2 (C.A.A.F.1998).

. Miranda v. Arizona, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966).

. Because • Appellant frames the issue in the context of the public safety exception, we discuss this exception infra. We note, however, that other grounds also support the conclusion that MAJ Warren's brief questioning under the attendant circumstances did not violate Appellant’s Article 31(b), UCMJ, rights. Our case law provides that these warnings are not required when an accused's questioner is “fulfilling] his operational responsibilities” and not attempting "to evade constitutional or codal rights.” United States v. Loukas, 29 M.J. 385, 389 (C.M.A.1990). ners, MAJ Warren, who served as an intelligence officer, tasked himself with security following Appellant's attack. MAJ Warren’s purpose was operational as demonstrated by the obvious safety concerns and his limited questioning of Appellant. MAJ Warren also was not seeking to avoid Appellant’s statutory or constitutional rights. Given the urgency of the threat to Camp Pennsylvania after Appellant’s attack and MAJ Warren’s ad hoc security position, we find that MAJ Warren was acting in an operational capacity and conclude there was no need to provide Appellant with an Article 31(b), UCMJ, warning. Loukas, 29 M.J. at 389.

. We note that whether Appellant’s admission was voluntary is a closer question.. When evaluating the voluntariness of a statement, we "review the totality of the circumstances to determine whether Appellant’s 'will was overborne and his capacity for self-determination was critically impaired.” United States v. Chatfield, 67 M.J. 432, 439 (C.A.A.F.2009) (quoting United States v. Bubonics, 45 M.J. 93, 95 (C.A.A.F. 1996)). This inquiry examines "the accused's age, education, experience and intelligence.” Id. at 439-40. Certain factors support the position that Appellant’s statement was coerced, such as Appellant being physically secured and questioned by a superior commissioned officer. See United States v. Jones, 73 M.J. 357, 360 (C.A.A.F.2014) (noting existence of subtle pressures in militaiy society when questioned by militaiy superior); United States v. Morris, 49 M.J. 227, 230 (C.A.A.F.1998) (examining whether physical abuse was factor in confession). We also recognize that MAJ Warren pointed a weapon at Appellant, but the military judge found that Appellant "never saw the weapon pointed at him.” Appellant does not state why this finding is clearly erroneous, so we do not consider MAJ Warren's brandishing the weapon in our analysis. Further, any other coercive factors were minimal, and we therefore find under the totality of the circumstances that Appellant’s confession was voluntary given his age, his college education, his rank as an NCO, and his intelligence. See Morris, 49 M.J. at 230 (noting accused's age and education as factors in determining coercive nature of interrogation). Cf. United States v. Carroll, 207 F.3d 465, 472 (8th Cir.2000) (finding use of physical force to subdue defendant resisting arrest did not render confession involuntary).

. Following Appellant's conviction, the Government, without objection from Appellant, withdrew one of the aggravating factors, leaving only one — that there were multiple convictions of premeditated murder in the case.

. In his reply brief. Appellant notes two other differences between the military and civilian systems: (1) the military system did not allow him to be tried by a military judge alone; and (2) the military system only provided one peremptory challenge instead of the twenty permitted in the civilian system. While we recognize differences exist, we find no unjustifiable differences that rise to the level of an equal protection violation.

. We also doubt that we have the authority to hold "capital punishment per se violative of due process.” See United States v. Sampson, 486 F.3d 13, 28 (1st Cir.2007) (citing Chapman v. United States, 500 U.S. 453, 465, 111 S.Ct. 1919, 114 L.Ed.2d 524 (1991)); United States v. Quinones, 313 F.3d 49, 70 (2d Cir.2002).

.The Supreme Court has identified three discrete classes of offenders who are exempt from execution under the Eighth Amendment: (1) those who are insane (and we note that being insane is not the same as having a mental illness), Ford v. Wainwright, 477 U.S. 399, 410, 106 S.Ct. 2595, 91 L.Ed.2d 335 (1986); (2) those who suffer from intellectual disability, Hall v. Florida, — U.S. -, 134 S.Ct. 1986, 1992, 188 L.Ed.2d 1007 (2014), Atkins v. Virginia, 536 U.S. 304, 321, 122 S.Ct. 2242, 153 L.Ed.2d 335 (2002); and (3) those who were under the age of eighteen when they committed their crimes, Roper v. Simmons, 543 U.S. 551, 575, 125 S.Ct. 1183, 161 L.Ed.2d 1 (2005).

. We recognize that appellate defense counsel signed a January 28, 2010, affidavit identifying certain behaviors by Appellant that they believed might call into question Appellant's competency to assist with his appeal. We are unaware, however, of any diagnosis from a mental health professional or any judicial finding that Appellant was or is insane.

. Even if Bullington could be analogized to the circumstances of this case, the record before us does not reveal the circumstances or results of the panel’s first vote. Therefore, there is no evidence upon which to base a conclusion that the panel’s ultimate sentence of death violated any double jeopardy principles.

. Cf. United States v. Durant, 55 M.J. 258, 261 (C.A.A.F.2001) (noting that lower court analysis is "extremely beneficial” in cases involving unique sentencing issues because "[sjound articulation of their rationale ... avoids speculation and promotes judicial economy”).

. Even if the CCA erred by failing to perform a proportionality review, we conclude that any error was harmless. See Article 59(a), UCMJ, 10 U.S.C. § 859(a) (2012). We require the CCA to employ a general offense-oriented proportionality review, United States v. Gray, 51 M.J. 1, 63 (C.A.A.F.1999), meaning that the CCA must consider whether the sentence is appropriate for the crimes of conviction and whether the sentence is generally proportional to those imposed by other jurisdictions under similar situations. Curtis, 33 M.J. at 109. To perform this latter function, the service courts may consider military cases, federal district court cases, and Supreme Court decisions on state cases involving circumstances similar to an appellant’s. Gray, 51 M.J. at 63; Curtis, 33 M.J. at 109. Here, the Government has adequately shown that the capital sentence was both appropriate and proportional for Appellant’s actions.

. There is authority that the use of joint affidavits is "undesirable.” Masiello v. United States, 304 F.2d 399, 402 (D.C.Cir.1962) (discussing joint affidavits in warrant applications). As noted infra, we agree with this assessment. However, a federal district court also has noted that it was unable to find "any authority for the proposition that the use of a joint affidavit is per se improper” and that "numerous courts” in the Second Circuit had referred to or relied on them. Steward v. Graham, No. 01-CV-0569, 2007 U.S. Dist. LEXIS 101402, at *26 n. 14 (N.D.N.Y. July 24, 2007), adopted by 2008 U.S. Dist. LEXIS 40381, at *3 (N.D.N.Y. May 19, 2008), 2008 WL 2128172, at *10 n. 14 (N.D.N.Y. May 19, 2008).